HILDA S. KAZARAS, Appellant v. MANUFACTURERS TRUST COMPANY et al., Respondents.

First Department, June 28, 1957.

228

*Leonard Hemley* of counsel (*Sol A. Liebman* with him on the brief; *House, Grossman, Vorhaus & Hemley,* attorneys), for appellant.

*William Piel, Jr.,* of counsel (*Gorden R. Erickson* with him on brief; *Sullivan & Cromwell,* attorneys), for Manufacturers Trust Company, respondent.

*Lester Lewis Jay,* respondent in person.

*Nathaniel Katz,* guardian ad litem for Peter Kazaras and another, infants, respondents.

BREITEL, J. P. In this action, the settlor, who is also the life beneficiary, of an *inter vivos* trust seeks rescission of the trust on grounds of fraud, duress and undue influence. After trial, it was held that there had been fraud, duress, and undue influence, but, because of subsequent ratification by the settlor-beneficiary, the trust was held valid and subsisting. From the judgment dismissing the complaint plaintiff appeals. The trustee, a defendant in the action, argues for affirmance, and also that the findings by the trial court with respect to fraud, duress and undue influence are erroneous.

The judgment should be affirmed, on the ground that there was no fraud, duress or undue influence, and, even if there were, as developed in the concurring opinion of Mr. Justice RABIN, there was a ratification thereafter by the settlor-beneficiary.

The case is an unusual one. Involved is an intimate relationship betweeen father and daughter, and a transaction occurring entirely in a family milieu. Concededly, the actors were dealing with one another out of love and affection, and with deepest concern for each other.

This is what happened.

The father, now dead, had come to this country as an immigrant and prospered greatly. By his first wife he had the daughter who is the plaintiff in this action. When only six months of age, she was a victim of poliomyelitis, as a result of which she was to be forever physically disabled. However, mentally, she is of bright and vigorous mind. She had been an outstanding student and had engaged in graduate university studies. For most of her life she walked in braces. In her early thirties, after a lifetime of extended medical treatment, including surgery, she was able to walk without braces, but still required the aid of two canes.

When 33 years of age, plaintiff met a man on a cruise ship. He was three years her junior, with intellectual and artistic interests, but without regular employment or income. A romance developed, and, in 1949, they were married.

The record is unclear whether this marriage was welcomed by the father. Plaintiff says that the father never objected to the son-in-law, but there are many circumstances which indicate that he had strong reservations.

The newly married couple spent most of their time in France, with infrequent visits by the daughter to her parents at their home here in New York. By January, 1952 many things had happened. Plaintiff was pregnant, and because of her physical condition it was known that the child could only be delivered by Caesarean section. The father, sick with diabetes, had sustained

a coronary thrombosis. The husband was seriously ill, in a Paris hospital, suffering from ulcers and requiring critical surgery, with no assurance of successful outcome. During the week preceding the event with which we are most concerned, the daughter sustained a sprained ankle. She was then staying in her father's apartment in Manhattan, while the father and his wife were in Florida. It was during this time, on January 17, 1952, that plaintiff signed the trust indenture which she seeks to annul on the grounds of fraud, duress and undue influence. The agent of her father in procuring this execution was one Niden, the father's accountant, also now dead, who is supposed to have used threats and made statements on the basis of which plaintiff grounds her action.

Before her marriage, plaintiff had always been supported by her father. After the marriage, the couple lived in France, supported entirely by him. The husband's medical bills, in the past and those to come, were being paid, or were to be paid, by the father. The daughter was supplied with many additional facilities and aids required by reason of her physical handicaps. The impending Caesarean delivery was to be financed by the father. He, as noted before, was himself an ill man.

Niden, the father's agent and accountant, is supposed to have told plaintiff, according to plaintiff, that unless she signed the trust indenture, the father would be angry, his health would be jeopardized, and he would undoubtedly cut off all support for her, her husband, and the child to come. He is said to have raised his voice in accomplishing his objective. At the time of the signing of the indenture, concededly, there was no annex attached specifying the property that was covered in the trust indenture. The annex was to be signed later, within one day after the birth of her child in a New York hospital, following a Caesarean section. On the occasion of signing the indenture she was told that she had no recourse but to sign. It is true that, then, when she wished to ask some questions concerning the content of the indenture, which was a technical document defining future interests, she, at Niden's suggestion, telephoned her father's lawyer, a senior partner in a prominent law firm. Her question with regard to what provisions could be made for future children that might be born to her was narrowly answered by the lawyer. She says she was refused the opportunity to consult with a lawyer of her own choosing. Finally, being ill, distraught and desperate, she signed.

Before resuming narration of the facts, the nature of the trust indenture and the objections to it by plaintiff require consideration. There is no claim that the trust indenture was

made for the purpose of benefiting the father or any third person.* Indeed, the daughter concedes that her father's conduct was motivated only by love and affection. The correspondence between the father and daughter amply sustains this conclusion. But the trust indenture does have certain unusual aspects. It placed under the trust, assets, the title to which the father had transferred to the daughter on prior occasions by way of gift. These assets consisted of a note of one of the family corporations, stock in the family corporations, some mortgage bonds, and the remainder interest of plaintiff in a life insurance trust that the father had previously established. These assets were, or are now, worth something between $100,000 and $200,000.

Apart from what the daughter was to receive by way of savings bank Totten trust and under the will of the father, the entrusted assets comprised all of the assets expected to be received by her in the event of her father's death.

The trust provided that she was to receive an income of $650 per month for her life, with power to invade principal for the purpose of making or applying payments. Any excess income was to be accumulated for the child that was then *en ventre sa mere,* and such accumulation was to be paid over to the child at his majority.

In the event of the death of the settlor, the principal of the trust estate was to be divided into as many equal shares as there were then living children of the daughter, including the child *en ventre sa mere.* As to that child the income was to be paid directly to him for his life, and on his death the principal was to be paid over to the then living issue of the daughter's sister, Norma Zucker. With respect to the other children that the settlor might have, since they were not in being, the income was to be applied or paid over after majority, so long as they should live, or until the death of the younger of the children of the daughter's sister, Norma Zucker, whichever occurred sooner. The remainders in these instances, too, would pass to the issue of Norma Zucker. The effect of these provisions was that the corpus of the trust, except as it might be invaded, was never to go to the daughter's children, but would go to her nieces by her sister, Norma Zucker.

Plaintiff says that she did not know that her own assets were being placed in trust, and that she believed that the father was providing assets of his own for that purpose. She even testified

---

* Actually, there is a remote benefit to the children of Norma Zucker, assuming that the principal is not eaten up by the power to invade principal. But none would argue that this was a motivating factor.

that Niden so told her. In any event, she contends that she would have never consented that any of her assets be so placed that they would never descend to her own children. Moreover, she would never have willingly consented to the discrimination between the child she was then bearing and any children that she might subsequently have. Apart from her knowledge or understanding, she says that all that she did she did under duress and undue influence: in fear of her father's health, in fear of her husband's health, in fear of the effects upon her unborn child and her husband, and in a personal state of physical and mental distress.

The daughter has had a second child, also by Caesarean section. Her father died on November 19, 1954. The daughter and her enlarged family have been living on payments provided from the trust, including invasion, to some extent, of principal, and also on assets that she received under her father's will or at his death.* Until her father's death he, concededly, supplied funds beyond the income of the trust assets, as he had done before. Her husband is now employed at a salary of $60 per week. Just about one year after her father's death this action was brought to set aside the trust.

Returning now to the evidentiary facts which bear directly on the execution of the trust instrument, the following appears: The trust indenture was signed by the daughter on January 17, 1952. In the summer of 1951 she had been presented with a trust indenture similar, in large part, to the one that she eventually signed in 1952. This trust, too, made unusual provisions, which in fact were invalid, for any children she might have. This draft was discussed in great detail, even being corrected in several particulars by plaintiff. Most importantly, this draft also provided for the corpus to be eventually diverted to the children of plaintiff's sister, Norma Zucker. Although, at one point, plaintiff said that she did not recall going over the 1951 trust draft, she did recall her father discussing a trust with her in the spring of 1951.

It is of some significance that all of the intangible assets covered into the trust, insofar as the documentation was concerned, had always remained in the physical possession and control of the father. In fact, with regard to documents, other than those running to bearer, the daughter had, in the past,

---

* Under the father's will plaintiff received one quarter of his estate, but under a trust similar to that involved here. The widow received half, and the sister one quarter, but outright. This, of course, is apart from Totten trust moneys and plaintiff's share of a liquidated family corporation. These free assets amounted to some $42,000.

executed either blank indorsements or blank stock powers. She never received the income from these assets directly. Rather, the father disbursed to her whatever was needed for her and her family from his personal funds or those of the family corporations. She had also given her father, in April, 1949, just before her marriage, the broadest of powers of attorney over all her material affairs.

She never paid her own taxes. Everything was taken care of by her father or his accountant, Niden. Repeatedly she signed papers for her father without reading them, although sometimes she read them with care. Frequently, her father would ask her to sign papers, pointedly indicating that she was not to read them, or parts of them. Her father provided all of her expenses, and, even while her father was alive, she overdrew her checking account and he would provide the funds to take care of that too. Her father's will, in passing assets to her, makes the same trust provisions, with the same restrictions on the distribution of corpus, that are contained in this trust indenture.

In connection with the January, 1952, signing, plaintiff testified that she spoke with her father on the telephone and that he screamed at her because she expressed reluctance to sign. After she signed the trust indenture, and before she signed the annexed schedule of assets, she tried to discuss it with her father, but he was impatient and irascible; and her mother told her to desist because of her father's bad health. But, in the spring of 1954, she discussed the indenture with her father using a photostatic copy he had obtained at her request, but from which he had insisted on removing the annexed schedule of assets. Not until her father had died did she receive a copy of her own of the trust indenture, although she had asked for copies from Niden and from her father's lawyer. She never did ask the trust company for a copy.

After her father died, plaintiff first learned, she says, what assets had been placed in trust and she first learned the nature of the dispositions made with regard to her children. She denies that she ever received income statements or assets statements from the trust company which would have shown the sources of payments being made to her. The trust company records, on the other hand, show that such statements had been sent to her semi-annually. But, in March, 1955, she wrote a letter to the trust company, clearly indicating that she knew and had known that all of her assets had been covered into the trust.

In February, 1952, she discussed the matter with an attorney by the name of Levy; but he refused to give her any advice without seeing a copy of the trust indenture. Later she dis-

cussed it with her lawyer, Lester Jay, who was to be made one of the trustees in the place of Green, who did not qualify. Only some time later, when she told Mr. Jay all the circumstances of the 1952 signing, did she learn that she had a right to rescind the transaction. This action was brought shortly thereafter.

Niden, the father's accountant, was dead at the time of trial, but his deposition had been taken before trial. In it he denied any misrepresentations and denied any strong pressure by him in asking plaintiff to sign the trust indenture. He denied that he had raised his voice and said that he was merely doing what he was supposed to do at the request of plaintiff's father. The father's secretary, who is also the notary public who took the acknowledgment to the trust indenture, was present at the signing. She testified for plaintiff, but denied hearing any raised voices, or any threats, but did confirm that Niden refused to give plaintiff a copy of the trust indenture, since he said the papers were yet to be executed by others.

The mother and sister of plaintiff also testified on behalf of plaintiff. The mother, whom plaintiff always refers to as " mother ", is actually a stepmother and an aunt. The sister is a daughter of the father and the second wife. An interesting fact is that plaintiff insists upon referring to her half-sister as sister, and regards any other term as " silly ". Indeed, she insisted upon such a correction of nomenclature in the 1951 trust draft. The relationship among the mother and the two sisters is a warm and close one. They testified that plaintiff frequently signed papers in blank for the father or signed papers for him even when he refused to let her read them in their entirety. These witnesses also confirmed the fact that plaintiff was discouraged from pursuing financial and business discussions affecting herself with her father, because of possible effect upon his health.

The picture that evolves from this proof is a simple one in fact. Without dispute, the father was a dominating, successful businessman, with warm affection and deep concern for his unfortunate and disabled daughter. He appears as a man who built his fortune, and who never gave up completely the control that he had over his assets, even when, to some extent, he parcelled them out among the members of his family. One must infer the father's obvious mistrust of plaintiff's husband. The latter had married her after a casual meeting and under circumstances, which, perhaps unfairly, stimulated that mistrust in the father. One may also infer, without engaging in violent speculation, that, to this father, a man who was not a great

money-maker or a " good provider " was one who could not be relied upon always to do well by the disabled daughter.

Given these feelings, the father evidently felt bound to make sure that the assets he had accumulated, and the assets the daughter had received from him by way of gifts, would never be dissipated by a " stranger ", during his daughter's life or that of her children. To accomplish this he resorted to a device, albeit harsh, that in a family milieu is not unknown and is completely understandable. He, in effect, told his daughter, " You do as I say or else I shall not help you or yours." To this ultimatum he knew that she would have but one answer, because she would have no choice. This, however, is not the stuff of duress or undue influence cognizable in law or in equity.

The father had no legal obligation to continue the support of a daughter, aged 36, and married. He had no duty to provide for the grandchildren to be born. He had no duty, that a court could enforce, to provide for the medical expenses of his son-in-law, even if that son-in-law were *in extremis*. Only his conscience could—and did—dictate such concern and action.

Consequently, the father was entitled to say, in purport, " I shall continue to do all of these things, but for this you must do as I wish, and what I wish is that you put all of your financial matters completely in my hands. This I do not for my advantage but for yours. You know that I shall provide for your interest, as I have for 36 years." Thus, by his lights, he sought to protect his daughter. Perhaps he did wisely, perhaps he did not. Perhaps only time will tell.

But for a court the issue remains whether the father used unlawful means to accomplish the act of signature to the indenture. This is a question of law, not of fact. This instrument was but one in a series of many over the years of their relationship that the father had exacted from the daughter, either in blank or with her knowing only partially the full import and effect. Sign she always had. This she had done: first, because of the affectionate relationship between them; secondly, because she was most often the one benefited; and, thirdly, because she had no economic choice. True, on this occasion, the background was more dramatic.

Consequently, we cannot agree with the findings made by the trial court to the effect that fraud occurred or that duress and undue influence were exercised. Laymen might call what happened in this family milieu duress or undue influence, depending upon their point of view of what a patriarchal father may require of a dependent child. What courts of law or equity

may recognize as duress or undue influence is another matter entirely. Plaintiff knew exactly what was happening; it had happened before; and she was willing to accept the parental fiat because it meant continued support and donations from her father. Indeed, if the father had insisted upon a return to him of the assets he had given her, but from which she never received payments directly, and over which she exercised no control, she could, with reason, have done that too, in exchange for continued support for her and her family.

In discussing the facts and the evidence so far, plaintiff's version of what occurred and her own understanding is largely given credit. Actually, upon reading the testimony she is not entitled to quite that much. There are instances of marked evasion in her testimony. Her testimony with respect to when she first learned the contents of the annex to the trust indenture in which the assets are detailed is hardly credible. Her attempts to indicate that she could not understand even the basic purpose of the documents hardly accords with her demonstrated perception and experience.

Clearly appearing from the testimony is plaintiff's taking umbrage at the fact that, after her father had died, Niden caused the stopping of direct payments made for her support by the family corporations. Clearly appearing from her testimony, too, is the obvious attempt to shift all blame for what had happened from her father, whom she loved, and still loves, to Niden, who was but the father's agent. This, of course, she does too, because her father was in Florida at the time and at that distance was hardly an effective instrument, on the facts of this case, to accomplish the alleged fraud, duress, or undue influence. Difficult to believe, too, is plaintiff's testimony that she does not recall ever seeing the stock certificates which she concededly endorsed in blank.

Plaintiff is not a simple, untutored person. Her testimony and conduct in the courtroom reveal a good mind, a person of strong character whose own dominating qualities were perhaps exceeded only by those of her father. Indeed, the trial court had several occasions to correct her conduct. Despite the fact that she pleads the difficulty of maintaining herself on the income she is receiving from the trust, she has placed in banks and kept intact the cash funds that she has received from her father's estate following his death. There are other inconsistencies, and some have been referred to before.

So it is quite apparent that plaintiff was not the unaware, emotionally dependent subject that she would portray, who helplessly executed the trust indenture on January 17, 1952. On

the contrary, the record reveals a sharp, querulous, skeptical, and questioning individual, with no shyness in asserting her views or contentions, on the trial, and at the signing of January 17, 1952.

Turning to the applicable law, duress, in order to render voidable what was done, must have involved a wrongful act or a wrongful threat precluding the exercise of a free will. (Restatement, Contracts, § 492; Black on Rescission and Cancellation [2d ed.], § 221 *et seq.*; 17 C. J. S., Contracts, § 168 *et seq.*) For the purposes of this case the issue resolves itself into one of the wrongfulness of the acts or threats purportedly made by the father, or Niden on his behalf. Such acts need not be criminal nor clearly illegal. They must, however, involve an act or a threat of action from which the person sought to be influenced is entitled to be free. In this case the threats were to withhold what the father had a legal right to withhold. Hence, as a matter of law there could be no duress.

With respect to the claim of undue influence, as distinguished from duress, the scope of conduct, which may result in the voidability of acts done as a result of such influence, is much broader. Illegal action or illegal threats are no longer necessary. But in such case a critical element, almost invariably present, is advantage sought and obtained for the actor or another in whom he has an interest. (Restatement, Contracts, § 497; Black, *supra,* § 237 *et seq.*; 17 C. J. S., § 180 *et seq.*)

More particularly, with respect to unilateral trusts the courts have been quick to invoke equitable principles and relieve a settlor of his act. This they do where, by reason of lack of understanding, absence of independent advice, improvidence, unnaturalness of the trust, mental and physical condition of the settlor, and the like, it is clear that the settlor would not have created the trust of his own free will (Restatement, Trusts, § 333 and comments, but esp. comment c; 89 C. J. S., Trusts, §§ 76, 85; *Barnard* v. *Gantz,* 140 N. Y. 249; *Hays* v. *Union Trust Co.,* 27 Misc. 240; *Gibbes* v. *New York Life Ins. & Trust Co.,* 67 How. Prac. 207).

But this case involves an entirely different principle. Here the settlor knew what she was doing, and to the small extent that she did not, she knew the secrecy and exclusion from knowledge was deliberate. To this she acceded. This was the price — or the consideration, if one insist on applying a legal term of reference — for the settlor to continue receiving substantial economic benefits from her father, who was free, as a matter of law, to withhold such benefits. Thus, unlike here, the classic cases in which trusts have been avoided involved a purely

unilateral act. (See, *Barnard* v. *Gantz, supra; Hays* v. *Union Trust Co., supra; Gibbes* v. *New York Life Ins. & Trust Co., supra.*)

Disinterested advice, and even pressure, no matter how bad, are not to be confused with undue influence, for undue influence is tantamount to a species of cheating (cf. *Scheinberg* v. *Scheinberg,* 249 N. Y. 277; *Byrnes* v. *Owen,* 243 N. Y. 211; *Le Strange* v. *Le Strange,* 242 App. Div. 74). Thus, where a settlor, a day before she was married, was induced by guardians and the family lawyer, to entrust her property for her benefit, this court was not quick to set aside the trust on grounds of fraud or undue influence. Moreover, as in this case, the court noted the intelligence and keen perception shown by settlor in her testimony, in finding that she understood the full nature of her act. (*Ludlam* v. *Ludlam,* 194 App. Div. 411, 415, affd. *sub nom. Ludlam* v. *Connecticut Trust & Safe Deposit Co.,* 232 N. Y. 615.) Other jurisdictions have also distinguished between benevolent influence and pressure by friends or relatives from the influence and pressure exerted by those who seek their own advantage (e.g. *Willard* v. *Integrity Trust Co.,* 273 Pa. 24; *Hayward* v. *Tacoma Sav. Bank & Trust Co.,* 88 Wash. 542; *Riddle* v. *Cutter,* 49 Iowa 547, 554; for other cases, see 38 A. L. R. 985 *et seq.*).

Thus, the distinguishing features of this case, not unique but perhaps unusual, are that here the actor was not motivated by selfish gain and, secondly, the actor was, as a matter of law, making a substantial payment to the settlor. Clearly here the settlor felt the payment was of greater value than what was involved in creating the trust for her benefit. It was this differential the settlor willingly chose. So, too, very different is the rule that looks askance at gifts between parent and child and presumes that in such relationship the gift is the product of fraud or undue influence; for there, the actor seeks his own advantage and the one acted upon is unwitting (see, 3 Pomeroy on Equity Jurisprudence [5th ed.], § 962 *et seq.*).

Scott has summed up the several factors that apply to a case such as this: "The question in each case is whether in view of all the circumstances the settlor was improperly induced to create the trust. The mere fact that he was persuaded by another to create the trust, whether that other was the trustee or a beneficiary or a third person, is not of itself a sufficient ground for setting aside the trust. The mere fact that there was a confidential or fiduciary relation between the settlor and the trustee or the beneficiaries of the trust is not of itself a sufficient ground for setting aside the trust. Nor is it necessarily sufficient that it was improvident for the settlor to create the trust, or

that he failed to take independent advice of an attorney or of others before creating the trust. There is no rule which automatically determines whether or not the trust can be set aside because of undue influence. The question in each case is whether the trust was created under such circumstances that it would be inequitable not to permit the settlor to set it aside.'' (3 Scott on Trusts [2d ed.], § 333.3.)

In this case there is a family situation in which love and paternal pressure, selfishness and sacrifice, trust and mistrust, are all intermingled inextricably. What the father required, his motives therefor, the fact of plaintiff's yielding despite her wish to the contrary, and her reasons therefor, are patently clear and substantially undisputed. This would follow from plaintiff's testimony standing alone, and the conclusion is re-enforced when credibility is properly assigned.

Given this difficult family conflict, resolved in a fashion by mature and fully competent adults, there is no warrant for interference by the courts. There was no conspiracy to cheat. None can say that the provisions in the trust were improvident, in all the circumstances of this case. None should now, years later, substitute his wisdom for the wishes of the father or the consent then exacted from a daughter for what the father firmly believed was for her benefit. Nor should the court ignore the realities in this case as to the nature of the property involved. These assets were '' gifts '' from the father, from which the daughter never drew income, over which she had no actual control, and over which she had no detailed knowledge. This was the fact long before and on the day of the signing of the trust indenture. The settlor was not only her father's dependent, but also one of his financial alter egos. From his bounty, wrung at a price, she supported herself, her husband and her children. The trust was nothing new, and plaintiff comprehended this, although she did not like it.

The majority concurs with Mr. Justice RABIN in his view that, even assuming that fraud, duress or undue influence were present, there were positive acts of ratification. However, since a case of this character is best determined by equitable considerations, and since equity would be most reluctant to enforce an arrangement obtained by improper methods, we prefer not to rest our determination alone on the ground of ratification. But the very acts of ratification, of which there are many, reveal not so much a ratification of a foul deed done and acquiesced in, as a recognition that the transaction was free from fraud, duress, or undue influence.

Accordingly, the judgment dismissing the complaint should be affirmed, but the findings of fact and conclusion of law, inconsistent with this opinion, should be reversed or modified to accord therewith. There should be no costs awarded. Settle order.

RABIN, J. (concurring in result). I concur for affirmance of the judgment, but solely on the ground that plaintiff by her conduct ratified the trust indenture. The opinion of Mr. Justice BREITEL, on the issues of duress and undue influence is quite persuasive. However, despite the fact that I feel plaintiff did not make out a convincing case and that she knew fully the effect of the trust indenture when she signed it, it is my view that we should not disturb the trial court's findings.

Subsequent to January, 1955, when plaintiff admitted she had a copy of the indenture and had consulted her attorney about it, plaintiff received from the trustees a number of payments to meet her special needs. These consisted of the purchase of a new automobile, payment of outstanding debts and additional provision for living expenses, purchase of special attachments for the automobile, payment of sales tax on the automobile, purchase of an ankle brace and provision for the employment of a servant.

Defendants contend that the request by plaintiff for, and the acceptance of these payments by her, constituted a ratification of the trust indenture. All of these payments were for essentials and the only available resource from which they could be obtained was the trust fund. While in a technical sense the acceptance of the payments might tend to indicate a ratification still I do not think that standing alone they are sufficient to spell out a ratification in fact or in law. In view of plaintiff's circumstances the payments were for absolute necessaries and her acceptance should not be construed as an intention on her part to ratify the trust. Such an intention is essential for a finding of ratification (*Barnard* v. *Gantz,* 140 N. Y. 249). It was there said (p. 258): "In order to effect a ratification of such an act it is necessary to show that the party intended such a result after knowledge of all the facts, and especially the important fact, that it did not conform to her intentions." Nor do I think that plaintiff's request that a bill for attorney's services be paid out of the trust fund may be construed as an intention to ratify.

However, in 1955 there were two acts on the part of plaintiff, either of which in my opinion is sufficient to establish an intent to accept and ratify the trust indenture. The first consists of

her acquiescence in the appointment of a successor trustee who was designated at her specific request to replace her deceased father. On December 11, 1954, plaintiff asked that her personal attorney, Mr. Jay, be named as the substitute trustee. On February 23, 1955, Mr. Jay, with plaintiff's full approval, accepted the appointment. Prior to that time plaintiff had gone over the provisions of the trust indenture with Mr. Jay "very carefully" and was advised as to her rights. She knew at that time — if indeed she did not know it at the time of signing the instrument — the legal effect thereof. She also then knew that the corpus of the trust was made up of her funds only. Despite that knowledge she had Mr. Jay appointed trustee. Obviously she wanted him in that position to protect her interests. This, in my view, constituted an acceptance and ratification by her of the trust (*Rothschild* v. *Title Guar. & Trust Co.,* 204 N. Y. 458). Plaintiff certainly was acting under no duress at the time she approved of Mr. Jay's appointment as successor trustee, for prior to that time her father had died, thereby removing all fears which she says caused her to sign the original instrument. We thus have a clear act on the part of plaintiff affirming the trust, having as its object the protection of her interests therein. This step was taken by plaintiff freely, without fear of any kind and with full knowledge of all the facts.

The second act clearly showing an intention to ratify the trust occurred in March, 1955, long after plaintiff was fully acquainted as to her rights respecting the trust indenture. At that time she signed a formal document authorizing the transfer into the trust fund of an additional $36,000. And this transaction was completed only after she had consulted her attorney and been advised by him. This act, done deliberately and advisedly, in my opinion constitutes an affirmance and ratification of the trust.

I agree with Mr. Justice BREITEL that we should be reluctant to rest the validity of a trust of this nature merely on ratification, but the facts of this case are so clear and unequivocal as to impel a finding of ratification. Despite the fact that plaintiff was not happy with the trust and with full knowledge of all the facts indicating that it might possibly be avoided, she nevertheless by the acts referred to showed that it was her clear intention to affirm and ratify the trust.

For the reasons indicated I vote for affirmance.

BOTEIN, J. (dissenting). The Trial Justice has stated in his written opinion that were it not for the issue of ratification, he "would unhesitatingly set aside the indenture as procured

through undue influence and duress, and without a proper comprehension by plaintiff of the unnatural provisions of the indenture or that the subject of the trust was property which was already hers, rather than additional property which her father was putting in trust for her benefit.'' This strong, sweeping judicial acceptance of plaintiff's claims of duress and undue influence is buttressed by specific and definitive findings of fact that footnote the quoted statement. Some of these findings recite that at and about the time she was induced to sign the questioned indenture, plaintiff was in an advanced state of pregnancy; that she was 36 years old, had been stricken with poliomyelitis at the age of six months and had been seriously crippled thereafter; that she therefore apprehended a difficult delivery; that she had recently injured her right ankle and suffered intense physical discomfort as a result; that her husband was critically ill and without funds in a foreign hospital; that at about the same time her young godchild, to whom she was deeply devoted, had died suddenly; and that her father, whom she loved, was suffering from the effects of a recent coronary thrombosis and diabetic condition, and she had been told by his physician to avoid irritating him; and lastly, in these extremes, she and her husband had no funds or realizable assets, and were completely dependent upon her father to meet all current living and hospital expenses for herself and her husband. Her sole assets consisted of stock and obligations of corporations controlled by her father.

These facts are not in dispute. It would be difficult, even in fiction, to place a crippled, pregnant young woman in a setting where she would be more susceptible to the economic and emotional pressures that were allegedly applied by the forceful agent of a stern, unrelenting father.

The Trial Justice had no doubts that duress was exerted in every particular claimed by plaintiff. He specifically found, among other things, that she was threatened and convinced that if she held the proffered trust instrument even long enough to consult a lawyer of her own selection, her father would cut off further financial support, and that her refusal to sign immediately would so upset him as to endanger his life. She also believed, as the trial court found, that her refusal to comply would leave her and her husband penniless and without funds or resources — she facing what would be a difficult childbirth because of her physical condition, and he lying in a critical condition in a Paris hospital. It is true that an analysis of plaintiff's claim of fraud would yield up certain weaknesses and

inconsistencies that could justify rejecting the court's findings on that element of the case. Her claims of duress and undue influence, on the other hand, after searching inquiry emerge plausible, unshaken, and if anything, strengthened by the relevent documentary proof. The only testimony bearing on duress and undue influence was that of plaintiff, her father's secretary, and the examination before trial of his accountant, now dead — the accountant being the person who on behalf of the father directly made the threats and demands constituting the alleged duress. The secretary's testimony was unimportant, for although she accompanied the accountant when he secured plaintiff's signature to the indenture, she was not present during the entire conversation, and furthermore testified she was paying no attention and recalled little of what was said. The accountant's examination before trial was most unimpressive, as he contented himself with categorical denials of the statements attributed to him by plaintiff and was otherwise a most grudging and unco-operative witness.

The issue of duress, therefore, rests on the resolution of the conflicting testimony of plaintiff, who was seen and heard by the Trial Judge, and the recorded testimony before trial of a deceased person. It seems to me that in such a contingency an appellate court should set great store on the Trial Judge's appraisal of the credibility of the only witness whom he actually heard testify about the alleged duress. The only evidence in the case that purports to challenge plaintiff's version of what occurred between her and her father's accountant is the latter's prim denials of her charges of duress in the course of his examination before trial. The Trial Judge evidently believed plaintiff, and annotated this belief with copious findings. In rejecting the well-considered holding and findings of the Trial Judge and substituting contrary findings of its own, this court is also rejecting the impressive testimony of the principal witness who testified concerning the alleged duress at the trial — a witness it has never seen or heard.

Plaintiff's father probably had her best interests at heart. However, duress inspired by the most benevolent of motives can be just as devastating as duress inspired by malevolence. Also, the fact that the assets of the trust that were affected by the alleged duress were given plaintiff by her father does not condone duress designed to compel her to relinquish those assets.

Ordinarily, it could be argued that the type of financial pressure exerted against plaintiff was not such economic pressure

as would sustain the charge of duress. The essence of duress is conduct causing such a deprivation of freedom of action and will as to in effect deprive the victim of any genuine opportunity to give or withhold assent (5 Williston on Contracts [rev. ed.], § 1603). Here plaintiff, in a helpless condition, was entirely dependent upon and dominated by her father, who had absolute control of her only sources of income. Neither she nor her husband had, at the time, any potentialities for earning their own living. In view of the special relationship which she enjoyed with her father and her own hopeless situation, it would appear that she was the victim of " a moral coercion which destroyed the contract " (*Adams* v. *Irving Nat. Bank,* 116 N. Y. 606, 611). Her desperate situation was knowingly taken advantage of by her father. Under such circumstances "pressure which would not ordinarily amount to duress, might have such coercive effect as to invalidate a transaction " (5 Williston on Contracts [rev. ed.], § 1608; see, also, *Faulkner* v. *Waulkner,* 162 App. Div. 848; *Van Dyke* v. *Wood,* 60 App. Div. 208; *Sylvan Mtge. Co.* v. *Stadler,* 113 Misc. 659).

I would hold, moreover, that in view of the dire straits in which plaintiff found herself after the death of her father, her importuning of the trustees to invade the principal for certain specific payments did not constitute voluntary ratification of the trust indenture. These requests and the conduct of plaintiff subsequent to the execution of the trust indenture constitute a meager basis upon which to make a holding of ratification of an instrument procured by duress. I appreciate that this conclusion also represents a rejection of a holding by the Trial Judge. However, on this aspect of the case, unlike the duress issue, we can accept the substance of his relevant findings of fact, and still conclude that these facts do not spell out ratification by plaintiff with full knowledge of the facts and of her rights.

The judgment dismissing the complaint should be reversed and judgment should be granted plaintiff for the relief sought in the complaint.

Frank and Bergan, JJ., concur with Breitel, J. P.; Rabin, J., concurs in the result in opinion; Botein, J., dissents and votes to reverse in opinion.

Judgment dismissing the complaint affirmed, but the findings of fact and conclusions of law, inconsistent with the opinion herein, reversed or modified to accord therewith. No costs. Settle order on notice.