OPINION OF THE COURT
Edward J. Greenfield, J.
This case involves a challenge to the validity of a nonmarital “separation agreement” negotiated after the breakup of a long relationship. The agreement is claimed to be void because of extreme emotional stress at the time it was made and because it is alleged to have lacked consideration. There appear to be no reported cases dealing with the validity of a “separation agreement” between same-sex former partners.
The parties are self-described lesbians, now locked in a bitter battle in the aftermath of a 14-year relationship. Defendant Starrett is a successful doctor who obviously suffers from low self-esteem. While she is plain looking and considerably overweight, she describes plaintiff Silver, a younger woman, as strikingly beautiful, intelligent, but deaf — and a person who had difficulty in holding a steady job. Starrett invited Silver to live with her. She said this opened a new world for her — that it was exciting, mysterious and sensual to be with a beautiful deaf woman. As she was supporting Silver anyway, she ultimately offered her a paid position as “administrative assistant”, to do what she now describes as essentially “menial work”.
However, as time went on, Dr. Starrett came to feel she was being used financially and emotionally. She complained that she felt inadequate, and that Silver accused her of being “too fat and boring in bed.” She experienced stress in her medical practice, for she was dealing with patients who were dying of AIDS. She became depressed and suicidal. After intensive psychotherapy, she decided to tell Silver that they could not continue on. Silver responded with a long, emotional statement (annexed to Starrett’s affidavit) in which she said she was trying to transform her emotional hurt into forgiveness. First she set forth her own shortcomings in a long list of “If Only’s”— such as:
*513 “If only I had not thrown temper tantrums at you in front of others * * *
“If only I had not been so bitchy toward you and instead be more grateful for the good life you so generously gave me * * *
“If only I had fully understood what you really wanted from me * * *
“If only I had the humility, insight and sensitivity to avoid attacks, blame, control, threats, conflicts and confrontations”. But then, Silver went on to detail why she was upset and angry:
“I’m upset that I am suddenly unmarried. I’m furious that we had so much in common, as I really wanted this to work.
“I am angry because I was not important enough to you * * * I feel deeply betrayed and rejected by your attitude toward my deafness.
“I’m angry that you refuse to break the vicious cycle of coldness, icy defense and indifference. I’m pained that you withheld forgiveness to avoid loving me and prevent my loving you * * *
“I’m angry that you considered me the sole reason for all your unhappiness in life * * *
“I’m hurt that you refused to believe that I would take care of you, even financially.
“I’m angry that you use money as a power play and to hurt me to no end * * *
“I’m hurt that you zeroed in on to my most vulnerable spot— when you knew that I compensated for it through my non-financial contributions.
“I’m angry that you didn’t see how ineffective, painful and traumatizing a divorce can be for me * * *
“I’m pained that you didn’t want me to live with you * * *
“I’m pained at the thought of having to divide up our property.
“I’m upset that you tried to put me out to pasture.
“I’m hurt and overpowered with enormous grief.”
Having gone on for pages about her hurts and grievances, she then listed the dreams, hopes and aspirations that they might be able to share together.
This emotional letter, self-accusatory, blaming and conciliatory at the same time, is declared by Starrett to have caused her to suffer extreme guilt, but then, shortly thereafter, she got a letter from a lawyer representing Silver, stating that Silver *514 was seeking a settlement to get out of Starrett’s life. At this point, Starrett says, she became “crazed” and obsessed with getting Silver out of her life and home, even if she had to pay. Starrett contends, “she forced me to make these offers as a result of her greed and avarice and control * * * She refused to allow me to end our relationship until she was paid off’.
Plaintiff Silver’s position is that the initiative for a separation agreement with a payout came from Starrett, that Starrett prepared five successive drafts, that both parties were represented by counsel in the negotiations, and that the agreement was presented to Silver on a “take it or leave it” basis. Silver moved out, as agreed upon, and Starrett proceeded to make payments to Silver as provided in the agreement for the next three years. Starting in the fourth year, when payment was no longer required for a sum certain, but for the difference between $21,000 and Silver’s actual income, Starrett refused to pay, initially contending that Silver had not made any good-faith effort to obtain employment. She now argues that the agreement is void and unenforceable for duress and lack of consideration. Silver, now a resident of Seattle, Washington, sues for the sums due under the agreement for the fourth and fifth years together with attorneys’ fees. Defendant Starrett counterclaims for rescission and restitution of the sums already paid.
Discussion
When a personal relationship between two people comes to an unhappy end, money is the balm which will sometimes assuage the torment of failure. The obligations of one party to another may be mutually agreed upon, they may be implied, or they may be imposed by law. If there has been a legally recognized marriage the law will define the financial consequences that flow — for financial support, equitable distribution, real property interests and inheritance. Public policy, as it is embodied in the law, is vigilant to prevent overreaching by a dominant partner, even when there has been an express agreement. In nonmarital breakups, the law largely leaves the postrelationship consequences to such agreement as its parties may work out.
Despite the highly publicized case of Marvin v Marvin (18 Cal 3d 660, 557 P2d 106), where a California court awarded a non marital party, on her claim of “palimony”, an amount of money to enable her to get started again after a breakup, New York courts have emphatically rejected that approach.
*515 In Morone v Morone (50 NY2d 481), the Court, when required to pass upon an alleged agreement between two unmarried persons who had been living together, reaffirmed the longstanding doctrine that an agreement founded only on what has been termed a “meretricious relationship” (at 487) based on “illicit sex” would not be enforced by a court, but the fact of cohabitation without marriage would be no bar to carrying out an express agreement (but not an implied contract) within the normal rules of contract law based on consideration other than sex. (See also, Whorton v Dillingham, 202 Cal App 3d 447, 452, 248 Cal Rptr 405, 408.)
In Trimmer v Van Bomel (107 Misc 2d 201, 206, affd 82 AD2d 1023, appeal denied 55 NY2d 602, cert denied 456 US 918), involving a nonsexual relationship between an unmarried couple, a wealthy elderly widow and a gentleman who acted as her steady (and well-subsidized) escort, this court dismissed the claim of an implied contract for support beyond breakup, declaring: “The implied obligation to compensate arises from those things which, in normal society, we expect to pay for. An obligation to pay for friendship is not ordinarily to be implied — it is too crass. Friendship, like virtue, must be its own reward.” (Accord, Whorton v Dillingham, supra, 202 Cal App 3d, at 454, 248 Cal Rptr, at 409.) The court then applied the ordinary tests as to validity of an express contract, but found it wanting for vagueness, lacking specificity as to amount and duration.
In Kastil v Carro (145 AD2d 388), a woman employed by a law firm claimed an agreement with a partner with whom she had a personal and sexual relationship. When the relationship ended she received further payments for a while, but when they ceased she sued, claiming there was an oral agreement to continue payments until she could obtain a comparable position. The Court found there was no enforceable agreement, absent an expressly stated obligation.
In this case, there is no question as to the existence of an express written agreement worked out by the parties at the termination of their relationship, nor is there any question that defendant is refusing to abide by that agreement. Defendant’s position is that the agreement is void and unenforceable because of duress and lack of consideration.
Duress
This does not appear to be a case where one party totally dominated the other, or had the leverage to force the other to *516 act against her will. Each party had a desired objective, and was willing to make concessions to achieve it. That is the essence of every contract negotiation.
While agreement between spouses involves a fiduciary relationship and there is strict surveillance as to separation agreements between married persons, different considerations apply to nonmarital agreements. (Christian v Christian, 42 NY2d 63, 73.) The question is whether there is overreaching or unconscionability so that it is clear that the agreement is not arrived at by consent mutually and freely given. The exercise of one’s free will is not to be overborne. (Muller Constr. Co. v New York Tel. Co., 40 NY2d 955.) Pressures there may be, but pressures, whether emotional or economic, do not justify a contract later being set aside for duress. See, for example, the case of Kazaras v Manufacturers Trust Co. (4 AD2d 227, affd 4 NY2d 930), in which it was held that a crippled pregnant young woman, who desperately needed funds from her father, because her husband was critically ill, and who was told she had to sign an instrument without full consultation with a lawyer or she would be cut off, was not subject to duress. This was “a family situation in which love and * * * pressure, selfishness and sacrifice, trust and mistrust, [were] all intermingled inextricably.” (Supra, at 239.) The conflict having been resolved by mature and fully competent adults, there was no warrant for court interference. Duress may be by physical compulsion, by threat, or by the exercise of undue influence (tantamount to self-interested cheating). (Evans v Waldorf-Astoria Corp., 827 F Supp 911, affd 33 F3d 49 [2d Cir 1994].)
Similarly, the contention of duress, coercion and undue influence was rejected as a defense in the recent case of Lutnik v Lutnik (NYLJ, Apr. 14, 1998, at 26, col 5 [Sup Ct, NY County]). There, a wife claimed she was compelled to sign an unfavorable antenuptial agreement when her prospective husband threatened not to go through with the marriage unless she signed. As here, the agreement had gone through multiple drafts with the advice of attorneys on both sides. The defendant claimed that the plaintiffs threats rendered her “numb” (supra, at 26, col 6). The court held that did not establish coercion or the deprivation of free will. If a threat not to go into a relationship is not deemed to constitute duress, certainly a threat not to get out of a relationship amicably is not duress. Further, the fact that one party appeared to yield more in the agreement than the other does not make it unconscionable. “There is nothing in the record herein to indicate duress, mis *517 representation, or overreaching by appellant. The fact that respondent gave away more than he might legally have been compelled to give does not mean that the separation agreement was the product of overreaching by appellant.” (Groper v Groper, 132 AD2d 492, 497-498.)
On the breakup of their relationship, both women were confronted with pain, resentment and emotional loss. Dr. Starrett was not a helpless puppet being manipulated by the wily Silver. She had a clear objective — to get Silver out of her life. The agreement did not come about in impulsive fashion or through unrelenting crisis. It was defendant Starrett who first came up with a handwritten draft months before the agreement was finalized proposing to provide plaintiff with an annual salary and to buy out her interest in their Belmar house. There were several follow-up drafts and the seven-page agreement of March 1, 1991 was carefully set forth in lawyerly language. The very first paragraph recites that both parties had been represented by lawyers throughout the negotiation of the agreement. The agreement purported to be a final settlement of all claims between the parties “whether arising at law or in equity, or by statute, common law, or otherwise, and regardless of whether presently accrued, inchoate or at a future time.” Starrett agreed to pay plaintiff a “salary” of $30,000 annually for the next three years. In addition, she agreed to make annual gifts of $9,000 a year for three years tax free. Starrett agreed to file gift tax returns therefor. At the close of the three-year period, Starrett agreed to pay the difference between Silver’s annual gross income and $21,000 for the next two years. She also agreed to make contributions to Silver’s Keogh pension plan and to her dental and life insurance. They agreed to a division of their personal property and Silver agreed to vacate the various properties of Starrett and to relinquish all of her claims to any of Starrett’s holdings including the Belmar, New Jersey property.
The agreement itself has all the indicia of a carefully worked out mutual negotiation. Starrett had an objective, and by that agreement, she achieved it. Defendant not only ratified the agreement by her signature, but by her conduct in complying with the contract for the next three years. It was only in the fourth year that Starrett refused to make further payments, explaining that it was because of Silver’s failure to make a good-faith effort to get employment. (Nowhere in the agreement is there such a requirement.) A dispute also arose over whether Silver had accurately reported her actual income. *518 It was not until after this action commenced that Starrett, for the first time, raised the contention that the original agreement was the product of duress. This was clearly an afterthought.
If a party has indeed been placed under duress, then the forced agreement must be disavowed at the earliest possible opportunity. (See, e.g., Gallas v Greek Orthodox Archdiocese, 154 Misc 2d 494.) Even when the Statute of Limitations is not involved, the law is clear that a party seeking to repudiate a contract procured by duress must act promptly to disavow it or the contract is deemed ratified and the defense waived. (See, Matter of Guttenplan, 222 AD2d 255, 257; Bank Leumi Trust Co. v D’Evori Intl., 163 AD2d 26, 30; Bethlehem Steel Corp. v Solow, 63 AD2d 611.)
Defendant argues that the passage of time makes no difference in cases of duress because separation agreements procured by duress are to be considered void ab initio, citing Angeloff v Angeloff (56 NY2d 982) and Perl v Perl (126 AD2d 91). Those cases are not applicable here. They involve marital separation agreements and in each case a claim of duress was raised in court within eight months of the making of the agreement. Even in intraspousal situations the vast majority of cases involving separation agreements hold that they are merely voidable because of claimed duress, unconscionability, or undue influence, and the defense is lost by the passage of time, the making of payments, or the acceptance of benefits. “It has been recognized that the acceptance of the terms of a separation agreement, by payment or acceptance of payment constitutes ratification * * *A party ‘who executes a contract under duress and then acquiesces in the contract for any considerable length of time ratifies the contract’ (Sheindlin v Sheindlin, 88 AD2d 930, 931 * * *).” (Niosi v Niosi, 226 AD2d 510, 511-512.)
Defendant here made the so-called salary and gift payments for three years without a murmur and presumably had the payments reflected in her tax returns. In Groper v Groper (supra), where 21 months had elapsed, the Court stated (at 496) that time was: “more than sufficient for a party who has acquiesced to an agreement against his better judgment, or under duress, to raise his objections and disavow the agreement. The Court of Appeals has held that where there is no evidence that the plaintiff’s ‘claimed incapacity continued through the two years during which the contract was effective and fully performed by defendant, and the benefits received by plaintiff, the plaintiff must be deemed to have ratified the agreement *519 (Beutel v Beutel, 55 NY2d 957, 958 [1982]).” She does not claim that during that period she was under a psychiatric disability which rendered her clinically depressed, dysfunctional and unable to take protective steps. (See, e.g., Sanders v Rosen, 159 Misc 2d 563, 577.) There is no question that on these undisputed facts defendant chose to live with the agreement and to comply with it. The claim that she was in such emotional turmoil that she could not act to protect her interest is untenable. There certainly was ratification of the agreement.
Consideration
It is the further position of the defendant that even in non-marital agreements which are construed as ordinary contracts, the agreement must be considered void if it lacks consideration. Defendant contends that she was the party who gave up everything and that all plaintiff did was to agree to do that which she already had a legal obligation to do. The valid consideration which will support a contract need not be equal on both sides, and if a minimal yielding of a position by one side promotes an agreement, then it will be deemed enforceable. There is no need to measure the relative weight of the consideration provided by each party.
The agreement in question, drafted by lawyers, provides at the very outset that it is made “in consideration of the mutual promises contained herein”. The agreement “is executed as and for a final settlement of all claims between them”. Defendant agreed to make specified payments and plaintiff agreed to vacate the premises at 112 East 19th Street by March 1, 1991. They agreed to exchange releases and plaintiff expressly relinquished all claims to any and all holdings of the defendant, including three New York properties and a summer shore house in Belmar, New Jersey.
Defendant claims that the plaintiff was giving up nothing by this agreement as she would have been obliged to move out in any event, and she had no valid claims to any of the real property. The affidavits reveal that plaintiff did make some payments toward the maintenance of the apartment they lived in and that she provided some of the money necessary to purchase a time share in the house at Belmar. (Neither plaintiff nor defendant were on the deed to that house.) It should be noted that from the very beginning, defendant Starrett was proposing to “buy Ann out of the Belmar house at market value * * * for 28% of our Vs holdings”, and to divide all personal property as amicably as possible. Defendant can hardly be heard now to *520 argue that a property release she insisted on was of no value. Plaintiff resided in the 19th Street residential loft for many years. There is no need to parse out what property rights or tenant rights she may have acquired by living there and making some payments. Defendant wanted two things and wanted them enough so that she agreed to pay a considerable sum of money over a five-year period. She wanted plaintiff out of her apartment immediately without further disputes or complications, and she wanted her to relinquish any claim she might have to any of defendant’s property. She got what she bargained for. Defendant viewed the bargain as acceptable, and she termed the payments as wages and gifts, even though plaintiff was to perform no further services. That does not mean that the only supporting consideration was past services so as to come within the scope of General Obligations Law § 5-1105. What is recited in the contract is both past and present consideration, and that is sufficient to validate it.
Conclusion
Plaintiff has pleaded a valid and enforceable contract which was ratified by continued performance for three years, and is not subject to the defenses of duress and lack of consideration. Plaintiff is therefore entitled to summary judgment on the amounts demanded for the fourth and fifth years, as corrected and defendant’s counterclaims for restitution of the support already provided are dismissed. Further, the agreement provides that in the event one party is compelled to commence litigation to enforce the contract, the costs, disbursements and reasonable attorneys’ fees shall be awarded to the prevailing party. Plaintiffs attorneys have submitted a breakdown of the legal services performed and the valuation thereof. These are not contested by defendant and the court finds that the value of the services so itemized is reasonable. Therefore, plaintiff is entitled to an award of attorneys’ fees of $15,751.50 together with expenses necessarily incurred of $431.35.