SUN FOREST CORP., Plaintiff,

v.

Eli SHVILI and Paula Shvili, Defendants.

No. 01 CIV 0086 (GEL).

United States District Court, S.D. New York.

May 29, 2001.

370

Arthur M. Handler, Handler & Goodman LLP (Kristin T. Roy, of counsel), New York City, for Plaintiff Sun Forest Corp.

Franklin B. Velie, Salans, Hertzfeld, Heilbronn, Christy & Viener (Mark H. Goldey, of counsel), New York City, for Defendants Eli Shvili and Paula Shvili.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Sun Forest Corp. ("Sun Forest"), a New York corporation, originally brought an action styled "motion for summary judgment in lieu of complaint" against Defendants Eli and Paula Shvili (collectively, "the Shvilis"[1]) in the Supreme Court of New York, New York County, after the Shvilis failed to make payment on two promissory notes (the "Notes") held by Sun Forest. Following removal of the action to this Court by the Shvilis, who are citizens of Canada,[2] pursuant to 28 U.S.C. § 1441(a), Sun Forest renewed its summary judgment motion, and the Shvilis cross-moved to dismiss for lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2), and under the doctrine of *forum non conveniens*.

For the reasons that follow, the Shvilis' cross-motions to dismiss are denied. With regard to Sun Forest's motion for summary judgment, given that the record regarding Eli and Paula Shvili's dealings with Lenard Mandel, Sun Forest's principal, contains disputed issues of material fact that cannot be resolved without additional discovery (and, perhaps, a trial), the Court denies Sun Forest's motion, without prejudice to renewal at a later stage of the case.

## BACKGROUND

The essential issues in this case concern the genesis of the Notes on which Plaintiff relies—both how the Notes came to be signed and what underlying transactions gave rise to the Notes. The following facts are drawn from the various affidavits submitted by the parties. Where the parties disagree, the disagreements are set forth. Where no dispute is noted, the facts are not controverted by the parties.

### Mandel's Initial Contacts with the Shvilis

Eli Shvili is a real estate developer whose business is primarily based in Toronto, Ontario. For at least the past several years, Eli and his affiliated entities have been involved in a variety of real estate and project finance ventures in

---

1. The Shvilis may also be referred to as, respectively, "Eli" or "Paula" when it is necessary to distinguish between them.

2. The Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(2).

North America and the Middle East. (Eli Shvili Aff. ¶¶ 4–5.)

In the summer of 1997, Eli Shvili and his personal attorney, Eli Gutstadt, traveled to New York City to meet with Lenard Mandel, a real estate attorney.[3] (Mandel Reply Aff. ¶¶ 8–9.) Mandel is a retired member of the Manhattan law firm White & Case LLP ("White & Case"), who, at that time, was denominated either a "partner emeritus" or "of counsel" to the firm and maintained an office there. (*Id.* ¶ 8; Goldey Aff. Exs. B & C.) In addition to his affiliation with White & Case, Mandel is also the principal of Mid–City Realty LLC ("Mid–City") and Sun Forest Corp. ("Sun Forest"), entities that conduct business for the benefit of Mandel and his family members. (Mandel Reply Aff. ¶¶ 1, 8.) He resides in New York. (*Id.* ¶ 73.)

During the meeting, Eli Shvili told Mandel that he intended to form a joint venture called the Harlem Group LLC (the "Harlem Group") with two other Toronto families—the Kerbels (of which Paula is a member) and the Muzzos—and a non-profit organization called the Consortium for Central Harlem Development, Inc. ("Consortium").[4] The Harlem Group, Eli said, planned to construct a major residential housing effort in conjunction with a large urban revitalization project called the Bradhurst Project, and requested Mandel's

assistance in facilitating the joint venture. (*Id.* ¶¶ 10–11.)

Mandel contends that Paula Shvili was also heavily involved in the financing, planning and subsequent business activities of the Harlem Group (*Id.* ¶¶ 9, 11), and that at meetings with Mandel she "spoke knowledgeably about the businesses in which she is involved and actively participated in meetings and discussions concerning the direction of her interests." (*Id.* ¶ 49.) However, Paula denies Mandel's assertions about her participation in the development project. Instead, she avers that she is "essentially a housewife" whose sole forays into the real estate business have consisted of certain investments "managed by my family, investment professionals and by my husband." (Paula Shvili Aff. ¶¶ 3–4; *see also* Bernholtz Aff. ¶ 4 & Gutstadt Aff. ¶ 3.) She acknowledges having accompanied Eli to New York, and even having met with Mandel, but contends that she came essentially for shopping and cultural activities, and that she did not participate in substantial business discussions. (2d Paula Shvili Aff. ¶ 3.)[5] Paula also contends, among other things, that she has neither maintained a bank account in New York nor "engaged in business" in this state. (Paula Shvili Aff. ¶ 3.)

Mandel agreed to advise Eli Shvili as to the formation and operation of the Harlem Group, but asserts that he never formed

---

**3.** Mandel claims that he and Eli Shvili first met in the summer of 1997, although documentary evidence of record indicates that the meeting may have been held as early as May of that year. (2d Goldey Aff. Ex. L.)

**4.** Eli, acting as the "Manager" of the Harlem Group, subsequently traveled to New York City on October 31, 1997, to execute an agreement with the Consortium. (Mandel Reply Aff. Ex. 12 at 33–34.)

**5.** Paula described her New York-related contacts as follows:

> Although I occasionally travel to New York, I have never done so for business purposes, but merely for pleasure travel and as a stop on the way to another destination.

(Paula Shvili Aff. ¶ 3.)

> I traveled to New York for personal reasons only. From time to time I accompanied my husband to meet with Mr. Mandel over lunch or at his office if the meeting was supposed to be short; otherwise I went out shopping or to a museum.

(2d Paula Shvili Aff. ¶ 3.)

an attorney-client relationship with either of the Shvilis with regard to that venture. Indeed, he states that he arranged for another attorney, Andrew Herz, of Richards & O'Neil LLP, to handle most of the legal work for the Harlem Group. (Mandel Reply Aff. ¶¶ 12–13.) The Shvilis counter by contending that, ever since the initial discussions about the Harlem Group, they have always viewed Mandel as "our lawyer." (Paula Shvili Aff. ¶ 5.) They also submit various correspondence from Mandel to or about them, including an August 28, 1997, letter to counsel for the Consortium for Central Harlem Development Inc., in which he referred to Eli Shvili as his "client" (2d Goldey Aff. Ex. L; *see also id.* Exs. K & M.),[6] and billing records showing that Mandel billed Eli for attorney time in connection with one of Eli's Middle East transactions. (3d Goldey Aff. Ex. Y.)

The Harlem Group's project, of course, was centered on developing property in New York. During the course of its operations, it also maintained an account at Chase Manhattan Bank in New York. Eli Shvili had signatory authority for the account and, indeed, often drew checks from it to pay for various expenses that the entity incurred. (Mandel Reply Aff. ¶ 64 & Exs. 19 & 20.)

***Further Harlem Group Dealings Involving the Shvilis***

As Eli Shvili and his partners in the Harlem Group continued to develop their joint venture, Mandel determined that the venture needed an experienced public relations team to develop relationships with government agencies and burnish its image. (Mandel Reply Aff. ¶ 14.) Accordingly, Mandel arranged for Eli to meet with public relations agent Howard Rubenstein at Rubenstein's New York City offices in September 1997. Subsequently, Eli, acting on behalf of the Harlem Group, executed a letter agreement with Rubenstein's company (Rubenstein Associates, Inc.) on October 7, 1997.[7] (*Id.* Ex. 14.) Rubenstein charged the Harlem Group $7,500 per month for his company's services. (*Id.* Ex. 14 at 2.) On March 9, 1998, Paula Shvili drew a check in the amount of $22,524.75 from her personal account at The Bank of Nova Scotia (located in Toronto) to pay Rubenstein Associates, Inc. (*Id.* Ex. 22.) The memo line of the check indicated that it was for a "CONSULTING FEE." (*Id.*)

Eli Shvili also hired a personal assistant, Nelson Dominguez, to assist him with the Harlem Group's Bradhurst Project. (*Id.* ¶ 15 & Ex. 16.) Dominguez worked out of an office located on Amsterdam Avenue in Harlem, and regularly copied Eli on invoices sent to the Harlem Group that reflect Dominguez's salary ($4,500 per month) and various expenses incurred as part of his work responsibilities. (*Id.* ¶¶ 15–16 & Exs. 16–18.) On March 9, 1998, Paula Shvili drew a check from her personal account in the amount of $9,000 to pay Dominguez his salary for January and February 1998. (*Id.* ¶ 16 & Ex. 21.) The memo line of the check indicated that it was for "SALARY Jan.–Feb. 1998." (*Id.*) Furthermore, Mandel contends that

---

6. Paula Shvili also avers that Mandel offered "to assist in arranging my estate," though she does not expressly state that he actually provided her with any legal advice concerning her investment holdings or estate planning. (Paula Shvili Aff. ¶ 5.)

7. Rubenstein immediately began to develop governmental contacts for his new client. For example, on December 23, 1997, he informed Eli by fax that Eli would be meeting with New York City's Deputy Mayor Rudy Washington on January 9, 1998, at Washington's office. (*Id.* Ex. 15.) The meeting apparently was held as scheduled.

Paula attended various meetings at his offices concerning the Harlem Group and also went to some of the venture's publicity events, including a high-profile Alliance Dinner attended by "prominent members of the Harlem community." (*Id.* ¶ 66.)

Paula Shvili, however, avers that she wrote the checks at her husband's direction and—despite having described their intended purposes in the respective memo lines—does not know "what purposes these checks were for." (2d Paula Shvili Aff. ¶ 5.) She denies participating in the meetings at Mandel's offices (although she does not deny having been present at them) or attending the Alliance Dinner (although she does not deny having attended other publicity-related functions). (*Id.* ¶ 3.)

### Mandel's International Business Dealings with Eli Shvili

While Mandel was advising Eli (and perhaps Paula as well) about the Harlem Group's Bradhurst Project, he was also assisting Eli with a variety of business ventures that Eli was exploring outside North America.

In July 1997, Eli Shvili, acting through an entity called Shvili, Inc., entered into negotiations to construct a natural gas pipeline between Egypt and Israel. To assist Eli, Mandel referred him to counsel in Cairo and to a White & Case partner in the firm's London office. Eli often traveled to Mandel's office at White & Case in New York City to discuss the transaction, and was also billed by the firm for work performed in connection with the proposed deal.[8] (Goldey Aff. Ex. C at 2; Mandel Reply Aff. ¶ 22(a).)

A few months later, Eli focused his attention on another project based in the Middle East. In March 1998, Eli met with Mandel at White & Case's New York City offices to discuss a natural gas transaction involving Gulf Interstate Co. ("Gulf Interstate"), a Lebanese entity. Eli subsequently returned to New York City for further meetings with his various attorneys. (Mandel Reply Aff. ¶ 22(c).) Several White & Case attorneys, including Mandel himself (who, as "counsel" to White & Case, billed 11.4 hours of attorney time to Eli in an invoice covering a period from March 11, 1998, through July 27, 1998), worked on the transaction, performing tasks such as due diligence and drafting documents. (3d Goldey Aff. Ex. Y.) Mandel avers that the Kerbel family was originally involved in providing financing for the deal, but decided for reasons unspecified in the evidence of record to "withdraw their financial support." Ultimately, the Kerbels' decision resulted in Eli Shvili's defaulting on approximately $500,000–$600,000 worth of deposits that he was required to make in furtherance of the venture. (Mandel Reply Aff. ¶ 22(c).)

Additionally, Eli Shvili, acting through an entity called Shvili International[9] that he apparently controls,[10] entered into negotiations commencing in 1999 and continuing into 2000 with individuals in Doha, Qatar, to develop a commercial real estate project. Eli attended several meetings at Mandel's New York City offices to discuss the transaction with Mandel and other attorneys at White & Case. (*Id.* ¶ 22(d).)

---

**8.** There is no indication in the evidence of record as to whether the deal actually closed.

**9.** Shvili International maintained a New York City office that has the same telephone, facsimile and cellular phone numbers as those that are listed on Nelson Dominguez's business card. (*See* 3d Goldey Aff. Ex. T; Mandel Reply Aff. Ex. 16.)

**10.** On at least one piece of Shvili International letterhead, Eli signed as "President." (2d Goldey Aff. Ex. P.)

Eli Shvili claims that throughout the course of his international business dealings with Mandel, he believed that Mandel acted as a legal advisor who also (as is further described below) provided financial support "in exchange for a percentage interest in the ventures that we supported." (Eli Shvili Aff. ¶ 5.) Mandel denies ever having acted as Eli's attorney (see, e.g., Mandel Reply Aff. ¶¶ 4, 12, 21, 24–29, 32, 48), but does not specifically deny that he was Eli's business partner. (Mandel Reply Aff. ¶ 4.) He claims, however, that the money he paid to or on behalf of various Shvili enterprises took the form of loans.

### Mandel's Loans to and Other Financial Dealings with the Shvilis

As the financial pressures associated with the Harlem Group's Bradhurst Project and Eli's various international projects began to mount, the Shvilis (and their associated enterprises) looked to Mandel for financial assistance.

The apparent beginning of the Shvilis' financial difficulties coincided with the decision by the Kerbel and Muzzo families, sometime in early 1998, to withdraw their capital investments in the Harlem Group. Consequently, Eli Shvili became the sole owner of that venture's equity. (Mandel Reply Aff. ¶ 17 & Ex. 23.)

On June 8, 1998, Eli executed an agreement on behalf of the Harlem Group (and, apparently, in his individual capacity as well) with KLM North Realty LLC ("KLM"), a building contractor, to provide services related to the Bradhurst development project.[11] (Id. ¶ 18 & Ex. 24.) In accordance with the agreement, KLM paid Eli $400,000 for what Mandel terms a "good faith ... deposit." (Id. ¶ 18.) Eli then used the proceeds to satisfy outstanding obligations to the Kerbel family. (Id.) However, following the death of KLM's principal in a plane crash on June 9, 1998, the parties terminated the agreement, and Eli was required to return the deposit to KLM later that year. (Id. ¶ 18 & Exs. 24–25.)

For Eli Shvili, the combination of financial pressures associated with his international dealings, such as his default on deposits required for the natural gas transaction with Gulf Interstate and the necessity of returning $400,000 to KLM apparently exceeded his available resources. (Id. ¶ 19.) Accordingly, he (and perhaps Paula as well) turned to Mandel for assistance.

Mandel avers that on January 7, 1999, Mid–City (one of the companies that he controls) lent $300,000, at a rate of 7% per annum, to Kimoo Holdings Limited ("Kimoo"), a company wholly owned by Paula Shvili.[12] The loan, Mandel contends, was to be repaid on demand. (Id. ¶ 24 & Ex. 1.) That same date, however, Mandel (as Manager for Mid–City) and Eli Shvili (as President of Kimoo) executed an agreement stating that Mid–City, in addition to lending funds, would receive 29% of Kimoo's equity.[13] (2d Goldey Aff. Ex. Q at 2.) Moreover, Eli Gutstadt, an attorney who has represented the Shvilis on various matters (Gutstadt Aff. ¶ 2), contends that Mandel never actually lent money to Kimoo; rather, according to Gutstadt, Man-

11. Eli negotiated and executed the letter of intent in New York. (Mandel Reply Aff. ¶ 18.)

12. Paula Shvili avers that she recalls "signing legal documents related to this transaction at a later date" and that she was not involved in negotiating any of the legal intricacies. (2d Paula Shvili Aff. ¶ 8.)

13. The agreement also stated that Mid–City would be limited to receiving 28% of the distributions made from funds that Kimoo received from KML Engineered Homes Limited. (2d Goldey Aff. Ex. Q at 2.)

del paid $300,000 as consideration "to purchase shares" of the company.[14] (*Id.* ¶ 9.)

Mandel also alleges conclusorily that he lent money to the Shvilis jointly on several occasions. (*See, e.g.,* Mandel Reply Aff. ¶¶ 25, 27–29, 33–34, 38, 42.) However, the evidence of record suggests that all of the non-Kimoo transactions were, if anything, loans to Eli or entities that he controlled. Following entreaties from Eli Shvili about his need to satisfy commitments made to various parties in his Lebanese transaction, on February 23, 1999, Mid–City wired $175,000 to Gulf Interstate. (Mandel Reply Aff. ¶ 25 & Ex. 2.) Mandel characterizes the transaction as a loan (*Id.* ¶ 25), although the evidence of record does not indicate whether it was contemporaneously memorialized as such.[15] As described above, Eli also needed funds so that he could return the deposit money previously advanced to the Harlem Group by KLM Realty. Accordingly, on April 29, 1999, Mandel drew a check on his personal account (denominated as "Lenard H. Mandel Special") for $400,000 (equal to the full amount of the deposit), payable to Richards & O'Neil, one of the law firms that represented the Harlem Group. Mandel avers the money was lent to both of the Shvilis at a rate of 7% per annum. (*Id.* ¶ 27 & Ex. 4.) In neither case does Eli dispute Mandel's description of those particular transactions with specific denials or other evidence.

Additionally, Mandel claims that prior to August 1999, Mid–City made several additional loans to the Eli and to Kimoo, as follows:

- On March 24, 1999, Mid–City lent $30,000 to Eli Shvili and $50,000 to Kimoo, both loans at a rate of 7% per annum. (*Id.* ¶ 26 & Ex. 3.)

- At the request of Eli Shvili, on May 7, 1999, Mid–City wire transferred $174,900 to Gulf Interstate. (*Id.* ¶ 28 & Ex. 5.)

- On May 27, 1999, Mid–City lent Eli Shvili $50,000 at a rate of 7% per annum. (*Id.* ¶ 29 & Ex. 6.)

In these cases as well, Mandel presents no documentary evidence supporting his account, and Eli offers no specific testimony or evidence of any kind.

Mandel contends that by the end of July 1999, the Shvilis (or their affiliated entities) owed Mid–City an aggregate amount of $1,210,013,84. To memorialize the indebtedness, Mid–City drafted a Promissory Note, executed by Eli Shvili on July 29, 1999 (the "July Note"), pursuant to which Eli agreed to pay Mid–City $1.21 million, plus interest accruing at the rate of 7% per annum, on October 29, 1999, at a Toronto branch of The Royal Bank of Canada. (*Id.* ¶¶ 30–31 & Ex. 7.) The note also contained the following forum-selection and choice-of-law clauses:

> The enforcement of this Note and any obligations hereunder may be brought in any court in the State of New York, United States of America, and shall be

---

14. Separately, Mandel purchased 318 shares of Kimoo from Paula on September 22, 1999, at the price of one dollar per share. (Mandel Reply Aff. Ex. 44.) Much later, on May 9, 2000, Mid–City and Paula Shvili executed a Share Pledge Agreement relating to an entity called KML Engineered Homes Limited. That document recites that Mandel owns a 47.5% equity interest in Kimoo, and acknowledges that Paula is indebted to Mid–City. (Mandel Reply Aff. Ex. 45; Gutstadt Aff. ¶ 8.)

15. Indeed, with the exception of the loan agreement with Kimoo and a loan of $36,734.45 on January 21, 2000, none of the other loans made by Mid–City or Mandel were memorialized contemporaneously.

governed by and construed in accordance with the laws of that State. (*Id.* Ex. 7.)

Following the execution of the July Note, Mandel and Mid–City continued to extend funds to Eli. On July 29, 1999, Mandel drew a $100,000 check on his personal account, payable to Eli Shvili. Mandel characterizes this transaction as a loan, with interest accruing at the rate of 7% per annum. (*Id.* ¶ 32 & Ex. 8.) On August 16, 1999, Mid–City once again wire transferred funds (this time, $250,000) to the account of Gulf Interstate. Mandel also describes this transaction as a loan to Shvili. (*Id.* ¶ 33 & Ex. 9.)

To evidence the indebtedness incurred since the execution of the July Note, Mid–City drafted another, superseding, note, in the amount of $1.56 million, with interest accruing at a rate of 7% per annum, to be payable at The Royal Bank of Canada in Toronto, which *both* of the Shvilis executed on August 16, 1999 (the "August Note"). (*Id.* ¶ 35 & Ex. 10.) Like the earlier note, this was also to be payable on October 29, 1999. Mandel avers that he and the Shvilis engaged in "arm's length negotiations" concerning the note's forum-selection clause, and, at the request of the Shvilis, he altered the clause to permit an enforcement action to be brought in either Canada or New York State. The choice-of-law clause remained the same. (*Id.* ¶ 36 and Ex. 10.)

Eli Shvili claims that Mandel had "insisted" that Eli sign the August Note. (Eli Shvili Aff. ¶ 7.) Though Mandel characterizes all of the transactions as loans (Mandel Reply Aff. ¶¶ 19, 23–33), Eli says that the note "reflected the money that [Mandel] had advanced in furtherance of our business interests." (Eli Shvili Aff. ¶ 7.) The term "advanced" appears carefully chosen to avoid the term "loan" without clearly characterizing the "advance" as either a loan or a contribution to capital. Eli does, however, refer to two specific transactions that he claims were not antecedent obligations to Mid–City. (*Id.*)

By letter dated October 4, 1999, Mandel reminded Eli Shvili about the October 29, 1999, payment date for the August Note and requested that Eli make certain logistical arrangements with the Royal Bank of Canada, the situs of the account where Eli was to transfer the funds due. (*Id.* ¶ 37 & Ex. 35.) October 29 passed, however, and neither Eli nor Paula made any payments to Mid–City. (*Id.* ¶ 37.)

Nevertheless, Mid–City decided to forebear collecting on either the July or August Notes. (*Id.* ¶ 39.) Moreover, on November 23, 1999, Mid–City extended yet another loan to "the Shvilis" in the amount of $209,872,86. That same date, both of the Shvilis executed yet another promissory note in favor of Mid–City, in the amount of $1,803,446,36, with interest accruing at 7% per annum (the "November Note"), payable on demand. (*Id.* ¶¶ 38–39; Goldey Aff. Ex. F.) This note is the principal basis for the present lawsuit.

### Negotiations Over the November Note, and One Further Loan

Mandel contends that various provisions of the November Note were the result of specific bargaining with the Shvilis. According to Mandel, the Shvilis insisted on eliminating, among other things, a requirement that the note be presented for collection at the Shvilis' bank in Toronto. Mandel agreed, and the note instead specified that it would be payable on demand at Mandel's offices in New York City. The forum-selection (Canada or New York) and choice-of-law clauses (New York) were unchanged. (*Id.* ¶ 40.)

Paula Shvili contends that her husband "required" her to execute the November Note, and that Mandel "insisted that [Eli]

sign" it as well. (Paula Shvili Aff. ¶ 6.) In an affidavit, Paula describes her state of mind when Mandel presented the document to her and her husband for their signatures:

> Before [that] time I was unaware that my husband might have personally owed Mandel any money. I did not want to sign the promissory note. I did so only because I trusted my husband and his judgment on business affairs. I understood from my husband that if the document was not signed my husband's business relationship with Mandel would be harmed. I executed the document in Toronto. I received no advice from anyone about the terms of the promissory note or what those terms meant.

(*Id.*) Eli corroborates Paula's account of Mandel's insisting that both of them sign the note, and also states that some of the approximately $1.8 million owed on the note reflected "certain other payments, including a payment of approximately $86,000 to White & Case and $60,000 to [Mandel] himself." (Eli Shvili Aff. ¶ 7.) Apart from these specific, relatively small amounts, however. Eli does not specifically dispute Mandel's account of the nature of the payments made by Mid–City. Also, neither Eli nor Paula specifically addresses the genesis of the change in the payment term of the November Note.

On January 21, 2000, Mid–City lent $36,734.45 to Kimoo, at an interest rate of 7% per annum (Mandel Reply Aff. ¶ 42 & Ex. 11.) Mandel memorialized this transaction, which he arranged at the Shvilis' request, in a letter to Eli, in which he stated that it was "an additional loan to you and Paula which I will document by a separate demand note when we have time to attend to it." (*Id.* ¶ 42 & Ex. 36.) Both of the Shvilis proceeded to execute a promissory note in favor of Mid–City on January 24, 2000, in the amount of $36,734.45, payable on demand to Mid–City at Mandel's office in New York City (the "January Note"). The choice-of-law and forum-selection clauses were identical to those contained in the November Note. (Goldey Aff. Ex. G.)

With regard to the January Note, Eli contends that "both my wife and I did not wish to sign the note. I remember my wife was uncomfortable when signing the note." (Eli Shvili Aff. ¶ 9.) Paula maintains that Mandel had "insisted" that she execute the agreement. She continues: "When I said that I did not want to sign it he said, 'You signed the other one, what difference does it make?' or words to that effect. I remember these words because I did not appreciate him pressuring me to sign the note." Paula also avers that Eli asked her to execute the document, and "[w]hen I expressed that I did not want to do so he said words to the effect of, 'Don't worry, it's o.k.'" (Paula Shvili Aff. ¶ 7.) Neither Eli nor Paula contests that the January Note represents a loan to Kimoo, or that Kimoo was an entity owned principally by Paula.

Both of the Shvilis contend that they were not aware that by signing the promissory notes, they would be submitting to the jurisdiction of courts located in New York State (should any litigation be brought against them there) and that New York law would govern any such action. (Eli Shvili Aff. ¶ 10; Paula Shvili Aff. ¶ 8.) However, Mandel claims that the Shvilis evidenced knowledge of the clauses' legal consequences by negotiating a provision in the July Note (which also appears in the two subsequent notes that are at issue in the instant action) stating that an enforcement action could be brought in Canada. (Mandel Reply Aff. ¶ 50.) [16]

---

**16.** It is not obvious how this provision, which Mandel claims was inserted at the Shvilis'

Mandel claims that he never pressured the Shvilis to sign either the November or the January Notes. Rather, he avers that at the time Paula executed the January note, she provided him "with a list of her personal assets, thereby evidencing her substantial business interests and manifesting an understanding of the nature of her personal obligations she had undertaken in executing the notes." (Mandel Reply Aff. ¶ 50 & Ex. 43.) Paula does not unequivocally deny that she furnished a copy of the list to Mandel in January 2000; she does state, however, that Mandel first received it at a March 1998 meeting with Martin Bernholtz, an officer of the Kerbel Group. (2d Paula Shvili Aff. ¶ 7; Bernholtz Aff. ¶¶ 3–4, 6.)

Mandel also contends that Eli Gutstadt, the Shvilis' personal attorney, "had an opportunity to review and advise [his clients] with respect to the Notes." (Mandel Reply Aff. ¶ 52; see also id. ¶¶ 5, 47–48, 52, 57–59.) Gutstadt, however, denies that he had any "involvement in the drafting, negotiation or execution" of the Notes and did not see them "until after they had been executed." (Gutstadt Aff. ¶¶ 5, 7.)

On November 17, 2000, Mandel, acting as a manager of Mid–City, endorsed the November and January Notes to Sun Forest.[17] Sun Forest is a New York corporation with its principal place of business here. (Mandel Reply Aff. ¶ 1.) That same date, Sun Forest served demands on the Shvilis for the Notes to be paid in full, including interest accrued, on November 30, 2000. (Mandel Aff. Exs. B & D.) As of today, the Shvilis have failed to make any payments on the Notes. (Mandel Aff. ¶¶ 8, 15.)

### The Instant Litigation

On December 1, 2000, Sun Forest commenced an action for the amounts due under the November and January Notes in the Supreme Court of New York, New York County. Pursuant to the expedited procedure provided in N.Y. CPLR § 3213, the action was brought as a "motion for summary judgment in lieu of complaint." In the summons accompanying its motion papers, which were served on Eli Shvili on December 4, 2000 (Notice of Removal ¶ 3) (and on Paula Shvili shortly thereafter), Sun Forest noticed a return date of January 26, 2001. (Summons at 1.)

The Shvilis responded by filing a notice of removal in this Court on January 4, 2001.[18] Sun Forest then moved to remand the action to state court, asserting that the Shvilis had filed their notice of removal thirty-one days after being served—one day later than is permitted under 28 U.S.C. § 1446(b).[19] However, following a

---

request, benefits them. Since Mandel retains the election of where to sue to enforce the Note, including Canada only expands his options, while still allowing him to sue in New York if he chooses.

**17.** In his original affidavit, Mandel averred that the Notes were endorsed to Sun Forest on November 22, 2000. (Mandel Aff. ¶¶ 6, 13.) However, he states in his reply affidavit that the Notes were actually endorsed on November 17, 2000, and that his earlier statement was incorrect as a result of a "typographical error." (Mandel Reply Aff. ¶ 1, note 1.)

**18.** On January 15, 2001, Paula Shvili commenced an action in Ontario in an effort to invalidate her purported obligations under the November and January Notes. At oral argument, counsel for the Shvilis represented that his clients had agreed to an informal stay of the Canadian action pending this Court's adjudication of the cross-motions. (Tr. at 49.)

**19.** In opposing the motion, the Shvilis argued, among other things, that neither of them had been properly served pursuant to the terms of the Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. At

preliminary conference on January 23, 2001, at which the Court established a briefing schedule for the instant cross-motions, Sun Forest notified the Court by letter dated January 24, 2001, that it would withdraw it motion to remand.[20]

In accordance with a scheduling order entered by the Court on January 24, 2001, Sun Forest, relying exclusively on papers that it originally filed in state court, moved for summary judgment on its claims that Eli and Paula Shvili had breached their obligations to pay Sun Forest $1,840,180.70 (an aggregation of the principal owed on the November and January Notes), $130,844.70 in accrued interest as of December 1, 2000 (and $352.90 per day thereafter), and the costs that Sun Forest has incurred and will incur (including reasonable attorneys' fees) as a consequence of its commencing an enforcement action against the Shvilis. (Summons at 1–2.)

The Shvilis opposed the summary judgment motion, asserting several defenses. First, they argue that since neither of the two Notes is supported by adequate consideration, they are unenforceable *pro tanto* under the laws of either New York State or the province of Ontario. Second, the Shvilis contend that the Notes are invalid in either jurisdiction as a result of being procured by undue influence on the part of both Mandel (over both Eli and Paula) and Eli (over his wife). Additionally, the Shvilis cross-moved to dismiss, arguing that the Court lacks personal jurisdiction over them, and that New York is a *forum non conveniens* for this action. The Court heard oral argument on the motions on March 16, 2001, at which time

it invited the parties to file supplemental letter briefs on a variety of issues, including New York case law concerning the voidability of attorney-client transactions.

## DISCUSSION

### I. *The Shvilis' Cross–Motions to Dismiss*

Because the Shvilis' motion to dismiss on grounds of lack of personal jurisdiction and *forum non conveniens* raise procedural issues that the Court must consider before addressing the merits of Sun Forest's motion for summary judgment, the Court will turn first to them.

#### A. *Personal Jurisdiction*

Sun Forest argues that the Court has personal jurisdiction over the Shvilis on two separate grounds. First, it argues that the forum-selection clauses in the Notes are sufficient in themselves to constitute consent to the jurisdiction of this Court. Second, it contends that even apart from those clauses, both Eli and Paula have engaged in sufficient activity in New York to be amenable to suit here under New York's long-arm statute. The plaintiff is correct: the forum-selection clauses validly establish jurisdiction over both defendants, and even without such contractual jurisdiction, Eli and Paula would still be subject to suit in New York.

#### 1. *The Forum Selection Clauses*

Acknowledging, as they must, that the November and January Notes contain forum-selection clauses [21] that permit en-

---

oral argument, counsel for the Shvilis conceded that this defense has been abandoned. (Tr. at 48.)

**20.** In an order dated January 29, 2001, the Court ruled that the thirty-day period set forth in 28 U.S.C. § 1446(b) is not jurisdictional

and, therefore, can be waived. *See, e.g., Somlyo v. J. Lu–Rob Enterprises, Inc.*, 932 F.2d 1043, 1046 (2d Cir.1991).

**21.** The November and January Notes contain identical forum-selection clauses, which are as follows:

**380**

forcement actions to be brought in this District—and, concomitantly, subject the Shvilis to the jurisdiction of this Court—the Shvilis argue that the clauses are unenforceable because they were procured by Mandel (whom they believe to have acted as their attorney) "as a product of undue influence" or "overreaching." (Defs.' Mem. Opp. Summ. J. at 21–22.) Also, Paula separately contends that the forum-selection clause is invalid as to her, because she signed the Notes as a consequence of undue influence exerted by her husband. (*Id.* at 24.)

The undue influence claim presents an interesting chicken-and-egg problem. Sun Forest relies on case law generally upholding forum-selection clauses and focusing judicial attention on whether the clause itself was the product of overreaching of some kind. The Shvilis claim that they were unaware of the jurisdictional effects of the Notes (Eli Shvili Aff. ¶ 10; Paula Shvili Aff. ¶ 8), and also object to the scope of the clauses. (Defs.' Mem. Opp. Summ. J. at 22.) However, they also attack the Notes themselves, which contain the clauses, as in their entirety the product of undue influence. (Defs.' Mem. Opp. Summ. J. at 10–11, 19–20.) They argue, in effect, that a forum-selection clause cannot be valid if it is a part of a document that is void in its entirety.

█ It appears most appropriate to address the validity of the forum-selection clauses separately from the defenses to the

Notes on the merits. The considerations of fairness and due process that govern personal jurisdiction are distinct from the legal rules governing contracts. For example, a voluntary consent to jurisdiction need not be supported by consideration. *Cf.* Wright & Miller, *Federal Practice and Procedure* § 1065 (discussing the doctrine of "implied consent" as a traditional basis for personal jurisdiction). Nor would it necessarily follow that if a defendant agreed to pay a sum of money due to overreaching of some kind, then his or her agreement, contained in the same document, to let a particular court determine whether overreaching had occurred was itself involuntary. *See Composite Holdings, L.L.C. v. Westinghouse Electric Corp.*, 992 F.Supp. 367, 369 (S.D.N.Y.1998) ("There is no reason to disregard this undertaking ... as long as Westinghouse did not procure [the forum-selection clause] by deception.")

█ In attempting to invalidate the forum-selection clauses, the Shvilis must overcome a substantial presumption in favor of their enforcement. In the seminal case of *M/S Bremen v. Zapata Off–Shore Company*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the Supreme Court held that forum-selection clauses in maritime contracts are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *Id.* at 14, 92 S.Ct. 1907 (internal quotations omitted). The Second Circuit, moreover, has a

---

The enforcement of this Note and any obligations hereunder may be brought in any court in the State of New York, United States of America or in Canada . . . . (Mandel Aff. Exs. A & C.) The Shvilis correctly note that the language of the clause does not mandate that an enforcement action be commenced in this state. However, they do not contest that if the clause is valid, they are subject to the Court's jurisdiction based on their consent to be sued in this District. *See,*

*e.g., Ultracashmere House, Ltd. v. Madison's of Columbus, Inc.,* 534 F.Supp. 542, 545 (S.D.N.Y.1982) ("In fact, the forum selection clause alone would constitute consent to personal jurisdiction."); *cf. AGR Fin., L.L.C. v. Ready Staffing, Inc.,* 99 F.Supp.2d 399, 402 (S.D.N.Y.2000) (discussing a clause that would subject the defendant to the jurisdiction of New York state or federal courts if the plaintiff elected to assert an action in either of those forums).

"strong policy" in favor of giving effect to such a clause. *See, e.g., Weiss v. Columbia Pictures Television, Inc.,* 801 F.Supp. 1276, 1278 (S.D.N.Y.1992) (citing *Bense v. Interstate Battery Sys. of America,* 683 F.2d 718, 721–22 (2d Cir.1982)) Accordingly, to render a forum-selection clause unenforceable, a party must make a "strong showing" that the drafter of the agreement included the clause as a consequence of "fraud, undue influence, or overweening bargaining power." *The Bremen,* 407 U.S. at 12, 15, 92 S.Ct. 1907; *see also Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993).[22] Most significantly for purposes of the instant litigation, as was discussed above, a party seeking to invalidate a forum-selection clause on grounds that she was coerced or fraudulently induced into acquiescing to the clause must specifically prove that but for the drafter's misconduct, it would not have been included in the agreement. *See, e.g., Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Composite Holdings, L.L.C. v. Westinghouse Elec. Corp.,* 992 F.Supp. 367, 368 (S.D.N.Y.1998); *A.I. Credit Corp. v. Liebman,* 791 F.Supp. 427, 430 (S.D.N.Y.1992); *Ritchie v. Carvel,* 714 F.Supp. 700, 703 (S.D.N.Y.1989) (Leval, J.). There is no reason why a party claiming undue influence, a close cousin to fraud or coercion,

should be held to a more relaxed evidentiary standard.

The record evidence in the instant case clearly indicates that even if Mandel had an attorney-client relationship with the Shvilis, he did not specifically exert undue influence over them to obtain a forum-selection clause permitting an enforcement action in New York. With regard to the November and January Notes, the Shvilis aver only that Mandel insisted that they execute them. (Paula Shvili Aff. ¶¶ 6–7; Eli Shvili Aff. ¶¶ 7, 9.) Paula avers that her husband "required" her to co-sign the November Note as a co-obligor and also asked her to sign the January Note. (Paula Shvili Aff. ¶¶ 6–7.) However, even if the Court were to credit the Shvilis' account of the transaction (which is controverted by Mandel (*see, e.g.,* Mandel Reply Aff. ¶ 50)), neither of the Shvilis specifically contends that Mandel used his putative relationship as their attorney to obtain the inclusion of a forum-selection clause allowing an enforcement action to be brought in a court located in New York. Nor has Paula specifically averred that her husband used undue influence to include the forum-selection clauses in the Notes and to obtain her acquiescence to them.[23] Consequently, under federal forum selection law,[24] the Shvilis have not advanced any defenses suggesting that the forum-selection clauses in the November and January

22. The Second Circuit has since extended *The Bremen's* holding to apply to forum-selection clauses at issue in diversity actions. *See, e.g., Jones v. Weibrecht,* 901 F.2d 17, 18 (2d Cir. 1990) (per curiam). While it may be questioned whether *Jones* correctly ruled that federal law controls this issue in diversity cases, *see Licensed Practical Nurses, Technicians and Health Care Workers of New York, Inc. v. Ulysses Cruises, Inc.,* 131 F.Supp.2d 393, 396–99 (S.D.N.Y.2000), New York law in any event also follows the *Bremen* test. *Brooke Group Ltd. v. JCH Syndicate 488,* 87 N.Y.2d 530, 534, 640 N.Y.S.2d 479, 481, 663 N.E.2d 635, 637 (1996).

23. Indeed, Eli Shvili avers that he was not aware of the forum-selection clause in the Notes. (Eli Shvili Aff. ¶ 10.) If so, he could not possibly have influenced his wife to consent to such a clause.

24. Federal forum-selection law governs in diversity actions. *See, e.g., Jones,* 901 F.2d at 19 & note 22 *supra.* Accordingly, the Shvilis' argument that the clauses are invalid under the laws of New York and Ontario (Defs.' Mem. Opp. Summ. J. at 21, 23–28) is misplaced.

Notes were defective because they were incorporated as a result of fraud, coercion, undue influence or overreaching behavior on the part of either Mandel or Eli Shvili.

■ The Shvilis further contend that when they executed the November and January Notes, they were unaware that they were consenting to personal jurisdiction in courts located in New York State for purposes of an action to enforce the Notes. (Eli Shvili Aff. ¶ 10; Paula Shvili Aff. ¶ 8.) However, their argument (the underlying facts of which are controverted by Mandel (*see, e.g.,* Mandel Reply Aff. ¶ 51)) is immaterial as a matter of law, because "a signatory to a contract is presumed to have read, understood and agreed to be bound by all terms, including the forum selection clauses, in the documents he or she signed." *Orix Credit Alliance, Inc. v. Brown,* No. 93 Civ. 1019(SWK), 1994 WL 392240, at *4 (S.D.N.Y. July 27, 1994).

■ Additionally, the Shvilis argue that the forum-selection clauses are invalid, because on their face, the clauses purport to subject them to the jurisdiction of any court in the United States or Canada. (Defs.' Mem. Opp. Summ. J. at 22.) However, a close examination of the clause as it has evolved from note to note illustrates that the Shvilis' contention is mistaken. In the July Note, the forum selection clause stipulated that an enforcement action:

> may be brought in any court in the State of New York, United States of America, and shall be governed by and construed in accordance with the laws of that State.

(Mandel Reply Aff. Ex. 7.) Plainly, this clause allowed suit only in New York (somewhat superfluously identified as part of the United States of America) and not in *either* New York *or* any other part of the United States of America. The clause was altered in the August Note (and remained constant through all of the subsequent promissory agreements between the parties) to read as follows:

> The enforcement of this Note and any obligations hereunder may be brought in any court of the State of New York, United States of America [sic] or in Canada, and shall be governed by and construed in accordance with the laws of the State of New York, U.S.A.

(*Id.* Ex. 10.) Given the wording of the clause in the July Note, it is quite evident that Mid–City was guilty of nothing more than a scrivener's error by omitting a comma that should have been placed after the word "America" in the August Note, and that the August Note authorizes suit only in New York or in Canada, and not in other places in the United States.[25] Moreover, even if the Court's construction of the above clause were incorrect, the Shvilis' contention about the clause's breadth fails, because they may not argue that the clause *could* be applied unfairly under their interpretation. Rather, they may only argue that the enforcement of the clause *in this action* "would be unreasonable under the circumstances." *The Bremen,* 407 U.S. at 10, 92 S.Ct. 1907 (internal quotations omitted). The Shvilis have not been sued outside of New York State, so they do not have standing to argue that certain hypothetical applications of the

**25.** If "New York" and "United States of America" were read as alternatives, the inclusion of "the State of New York" would be redundant. Moreover, if New York and the United States were intended, redundantly, as elements in a series, rather than simply as "New York, U.S.A.," one would expect the word "the" before "United States of America."

clause would be violative of the rules enunciated by *The Bremen* and its progeny.[26]

Consequently, because the Shvilis have not been able to demonstrate that the forum-selection clauses included in the November and January Notes were incorporated as the result of fraud, coercion, undue influence or overreaching, or that it would be unreasonable for the Court to enforce them, the Court finds that the clauses are valid and provide a sufficient basis for personal jurisdiction over the Shvilis.

### 2. *Long–Arm Jurisdiction*

■ Even if the clauses were void, however, the Court also finds by a preponderance of the evidence of record[27] that both Eli and Paula Shvili are otherwise subject to personal jurisdiction in New York State. In a diversity action such as the instant case, a district court first applies the long-arm statute of the forum state to determine whether personal jurisdiction lies. If the court finds that there is a jurisdictional basis under the long-arm statute, it must then consider whether such contacts are constitutionally sufficient under the Due Process Clause of the Fourteenth Amendment. *Central Sports Army Club v. Arena Associates, Inc.*, 952 F.Supp. 181, 187 (S.D.N.Y.1997).

■ Under New York law, a defendant is subject to what is commonly referred to as the court's specific jurisdiction if he "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. CPLR § 302(a)(1). For jurisdiction to attach under section 302(a)(1), a plaintiff must demonstrate that its claim arises out of the defendant's New York transactions. Such a showing can be made if the plaintiff can offer proof that the claim is "sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir.1997) (internal quotations omitted).

After evaluating the evidence of record, the Court finds that Sun Forest has proven by a preponderance of the evidence of record that Eli engaged in the following forum-related commercial activities that have a substantial nexus to the breach of contract claim at issue. First, with regard to the Harlem Group, an entity[28] of which he eventually became 100% owner (Mandel Reply Aff. ¶ 17 & Ex. 23), he traveled extensively to New York from 1997 through 1998 to conduct meetings—including one with the Deputy Mayor (*id.* Ex. 15)—related to its plan to develop real estate in New York City. In connection with that business activity, Eli, among oth-

**26.** The Shvilis do not argue that the clauses will deprive them of their "day in court due to the grave inconvenience or unfairness" of litigating in this District, or that they "contravene a strong public policy" of New York State. *Direct Mail Prod. Services Ltd. v. MBNA Corp.*, No. 99 Civ 10550(SHS), 2000 WL 1277597, at *7 (S.D.N.Y. Sept. 7, 2000).

**27.** At the pleading stage, it is generally sufficient for plaintiff to make a *prima facie* showing that the defendant is subject to the Court's personal jurisdiction. But if discovery has been taken, the Court must find by a preponderance of the evidence that it has jurisdiction over the defendant. *Kingsepp v. Wesleyan*

*University*, 763 F.Supp. 22, 25 (S.D.N.Y. 1991). To date, there has not been any jurisdictional discovery. However, given the accelerated nature of this action, and the likelihood that jurisdictional discovery will not be taken given the Court's disposition of the forum-selection clause issue, the Court chooses to apply the more stringent of the two standards.

**28.** The Shvilis have not argued that the Harlem Group is anything other than Eli's (and perhaps Paula's) proprietorship, and have proffered no evidence to suggest that it exists as a separate entity.

er things, contracted on behalf of the Harlem Group with Rubenstein Associates, Inc., to obtain public relations assistance for the entity's commercial activities. (*Id.* Ex. 14.) He also hired an employee, Nelson Dominguez, to assist him on Bradhurst Project-related activities. (*Id.* ¶ 15 & Ex. 16.) Dominguez worked in New York City and shared the same Manhattan office suite, land line, facsimile number and cellular phone number as Shvili International, in which Eli was an officer. (3d Goldey Aff. Ex. T, Mandel Reply Aff. Ex. 16.) Eli also had signatory authority for a Harlem Group bank account at Chase Manhattan Bank in New York City (*Id.* ¶ 64 & Exs. 19 & 20), and executed a contract in New York, on behalf of the Harlem Group, with a contractor named KLM, pursuant to which KLM extended $400,000 as a "good-faith deposit." (*Id.* ¶ 18 & Exs. 24–25.) After the death of KLM's principal, and Eli's partners' decision to pull out their financial support from the Harlem Group, he asked Mandel to lend him money so that he could return the deposit to KLM. Mandel subsequently lent Eli $400,000 on April 29, 1999, money which constituted part of the consideration for the November Note executed by Eli and Paula. (*Id.* ¶ 27 & Ex. 4.) Consequently, Eli's purposeful New York contacts on behalf of the Harlem Group proximately contributed to the execution of the note underlying the instant action, and collectively constitute a basis for long-arm jurisdiction under N.Y. CPLR § 302(a)(1).

Second, by executing the November and January Notes, Eli contracted with Mid-City, a New York corporation with a principal place of business in the same state, as a co-obligor for (as of December 1, 2000) approximately $2 million of indebtedness. The act of borrowing money from a New York-based entity can, when considered in combination with other contacts, give rise to jurisdiction under CPLR § 302(a)(1).

*Lancaster v. Zufle,* 165 F.R.D. 38, 41 (S.D.N.Y.1996). Moreover, it is undisputed that those Notes contained choice-of-law clauses specifying that New York law will govern any enforcement action brought on the Notes. Eli's acquiescence in having this forum's law of contracts govern any action arising out of the Notes, is also a "significant contact[ ]" with the state for jurisdictional purposes. *Id.*

Third, Eli traveled to New York City several times in 1998 to meet with White & Case attorneys who assisted him in formulating a project with Gulf Interstate to develop natural gas resources in Beirut. (Mandel Reply Aff. ¶ 22(c).) Eventually, Eli defaulted on approximately $500,000–$600,000 of deposits that he was contractually obligated to make in furtherance of the transaction, and he once again sought Mandel's financial assistance. (*Id.*) Mandel then wired at least $175,000 to Gulf Interstate on Eli's behalf so that he could satisfy his commitments to various parties involved in the transaction. (*Id.* ¶ 25 & Ex. 2.) This loan also constituted part of the consideration for the November Note that Eli executed. Accordingly, Eli Shvili's purposeful use of New York as a forum in which he received legal advice necessary for a transaction that led to his seeking another loan—which, ultimately, was an antecedent obligation for a promissory note—is also a basis for jurisdiction under CPLR § 302(a).

Having established that Eli is subject to New York's long-arm statute based on his transacting substantial business here, the Court next turns to whether it would be violative of federal due process standards to assert jurisdiction over him. Eli does not and cannot contend that his myriad of purposeful transactional contacts with New York during the 1997–98 period were "random or unintentional ac-

tions," *PDK Labs, Inc.*, 103 F.3d at 1111, such that basing personal jurisdiction on them would offend "traditional notions of fair play and substantial justice" under *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. Eli unquestionably "availed himself of the privileges of conducting business [in the forum state] so as to reasonably expect to be subject to suit here," *PDK Labs*, 103 F.3d at 1111, and the Court may therefore exercise personal jurisdiction over him under CPLR § 302(a)(1).

With regard to Paula, the evidence of record also demonstrates that she is subject to personal jurisdiction in New York State under CPLR § 302(a)(1). Even setting aside Mandel's disputed allegation that Paula actively participated in business strategy sessions in Mandel's office, it is undisputable that Paula engaged in various business endeavors relating to the Harlem Group, including paying Harlem Group obligations to Rubenstein Associates, Inc. (its public relations firm) and Nelson Dominguez (Eli's personal assistant) by drawing checks from her personal account. (Mandel Reply Aff. ¶¶ 16, 49 & Exs. 14, 16–18 & 21–22.) Although the record contains no evidence that Paula ever had a formal ownership interest in the Harlem Group, her activities on the entity's behalf constitute the type of purposeful New York-centered transactions that could give rise to personal jurisdiction in this state. Additionally, even if Paula's allegations that she was an unsophisticated businesswoman were credited, the record establishes that Paula (if she did not solicit Mandel directly) at the very least used Eli as an agent to recruit Mandel, a New York resident, to lend funds to Kimoo, an entity she owned, to purchase an equity interest in that entity. It is uncontroverted that Mid–City lent funds to Kimoo on at least two occasions, and those loans constituted anteced-

ent indebtedness that partially underlie both the November and January Notes. As stated above, the act of borrowing or soliciting money from a New York resident can, when considered in combination with other contacts, give rise to jurisdiction under section 302(a)(1). *See Lancaster*, 165 F.R.D. at 41.

Viewed in their totality, Paula's business-related contacts with New York are sufficient, and sufficiently closely related to Sun Forest's cause of action, to give rise to personal jurisdiction over her under N.Y. CPLR § 302(a)(1). And considering that Paula, by executing the November and January Notes, created an "ongoing relationship" with a New York-based corporation "that was to be governed and construed in accordance with New York law," Paula's interactions with the state were purposeful enough such that exercising jurisdiction over her would not be inconsistent with federal due process principles. *Lancaster*, 165 F.R.D. at 41–42.

### B. *Forum Non Conveniens*

██ The Shvilis also move to dismiss Sun Forest's action pursuant to the doctrine of *forum non conveniens*. They principally contend, based on an affidavit from an attorney in Ontario concerning that province's application of the undue influence defense, that because Ontario courts would not be likely to enforce any judgment from this District requiring the Shvilis to honor their obligations under the November and January Notes, it would be more efficient for the Court to dismiss the action and allow the parties to litigate their dispute in Ontario (where Paula Shvili has already commenced a parallel action). (Defs.' Mem. Opp. Summ. J. at 28–30.)

██ The determination of a *forum non conveniens* motion is a matter committed

to the Court's sound discretion. *Armco, Inc. v. North Atlantic Ins. Co. Ltd.,* 68 F.Supp.2d 330, 341 (S.D.N.Y.1999) (citing *R. Maganlal & Co. v. M.G. Chem. Co., Inc.,* 942 F.2d 164, 167 (2d Cir.1991)). Certain principles must guide the Court in exercising that discretion, however. Given that Sun Forest, a New York corporation with a principal place of business in the same state, "has chosen the home forum," the Court must accord even "greater deference" to Sun Forest's decision than is usually accorded to a plaintiff's choice of forum. *Guidi v. Inter–Continental Hotels Corp.,* 224 F.3d 142, 146 (2d Cir.2000); *see also The Michael Kors Co., Inc. v. Compagnia Internazionale Abbigliamento S.p.A.,* No. 93 Civ. 8127(SHS), 1996 WL 509725, at *3 (S.D.N.Y. Sept.9, 1996). Moreover, the existence of a forum-selection clause also counsels strongly against a court's dismissal of an action on *forum non conveniens* grounds. *Firemen's Ins. Co. of Newark, New Jersey v. Keating,* 753 F.Supp. 1137, 1145 (S.D.N.Y.1990).

Taking the strong presumptions in Sun Forest's favor into consideration, the Court will analyze the Shvilis' motion in light of the now familiar framework of private and public factors that the Supreme Court set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).[29] For the private factors, the Court is required to take the following into account:

(1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) [i]ssues concerning the enforceability of a judgment; and (5) all other practical problems that make trial of a case easy,

expeditious, and inexpensive—or the opposite.

*Murray v. British Broadcasting Corp.,* 81 F.3d 287, 292 (2d Cir.1996). As for the public factors, the Court must consider the following:

(1) the administrative difficulties flowing from court congestion; (2) the local interest in having controversies decided at home; (3) the interest in having a trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.

*Murray,* 81 F.3d at 293. The Shvilis cannot prevail on their motion unless they can demonstrate that the balance of the above-listed factors is "strongly" in their favor. *The Michael Kors Co., Inc.,* 1996 WL 509725 at *3.

Evaluating the private factors, the Court notes the Shvilis do not contend that they would be disadvantaged from a logistical perspective (i.e., witness availability and the availability of discovery mechanisms to allow them to examine evidence that Sun Forest intends to introduce in its favor should a trial be required) if they were compelled to litigate this action in the Southern District of New York. Rather, they simply contend that if Sun Forest were to attempt to enforce a putative judgment from this District in Ontario, an Ontario court would decline to do so as a matter of public policy. (Defs.' Mem. Opp. Summ. J. at 29.) However, the Shvilis' argument presupposes that they do not have any assets in New York (or in any other jurisdiction within the United States, for that matter) that Sun Forest could obtain in satisfaction of a

---

**29.** Sun Forest does not contest the Shvilis' assertion (Defs.' Mem. Opp. Summ. J. at 29 n. 8) that Ontario would be an adequate alternative forum.

judgment from this Court. Moreover, the Shvilis also assume that Ontario law would govern any judgment enforcement action that would be brought by Sun Forest in that province—a supposition that is disputed by Justice Peter de Carteret Cory, Sun Forest's expert on Ontario law, who is a former Justice of the Supreme Court of Canada. (Cory Aff. ¶ 14.) The private factors, therefore, do not weigh strongly in the Shvilis' favor.

As for the public factors, the Court finds that case law from this District and the Second Circuit is strongly in favor of enforcing forum-selection clauses such as the ones that the Shvilis voluntarily executed. *See, e.g., Weiss,* 801 F.Supp. at 1278. New York State also has an interest in allowing holders of promissory notes that are payable on demand here to bring enforcement actions in a convenient forum. Moreover, since New York law will govern this action (as will be demonstrated at pp. 388–90 below), the Court believes that there is a strong interest in allowing Sun Forest to litigate in a forum where the arbiter is learned in the applicable law. Accordingly, these factors weigh in Sun Forest's favor.[30]

The Shvilis have failed to satisfy their heavy burden of demonstrating that Sun Forest's decision to litigate against them in Sun Forest's home forum implicates *forum non conveniens* concerns. Consequently, their motion to dismiss is denied.

**30.** The Shvilis concede that they have no evidence that the dockets of the Ontario courts are any less congested than this Court's. (Defs.' Mem. Opp. Summ. J. at 30.) Neither party has demanded a jury trial, so that aspect of the public interest analysis is not implicated.

**31.** The Shvilis also argue that the Court should deny Sun Forest's motion because Sun Forest has failed to file a statement of disputed material facts, as is required under Local Rule 56.1(a). (Defs.' Mem. Opp. Summ. J. at

## II. Sun Forest's Motion for Summary Judgment

As a threshold issue, the Shvilis contend that although Sun Forest proceeded in state court pursuant to the expedited summary judgment procedures specified under N.Y. CPLR § 3213, it is precluded from doing so after removal of the action to federal district court. (Defs.' Mem. Opp. Summ. J. at 2.) Their argument, however, is misplaced. It is well established that the district court "takes the [removed] action in the posture in which it existed when it is removed from a state's court jurisdiction and must give effect to all actions and procedures accomplished in a state court prior to removal." *Miller v. Steloff,* 686 F.Supp. 91, 93 (S.D.N.Y.1988) (entertaining motion for summary judgment in lieu of complaint upon removal from state court); *see also Com/Tech Comm. Tech., Inc. v. Wireless Data Sys., Inc.,* 163 F.3d 149, 150–51 (2d Cir.1998) (endorsing adjudication of summary judgment motion upon removal from state court provided that defendant is allowed to raise defenses and counterclaims). Accordingly, because Sun Forest is not required to file a complaint before obtaining expedited consideration of its summary judgment motion, the Court will evaluate the merits of Sun Forest's motion as if it had been originally filed in this District.[31]

3–4.) While the Court does not condone Sun Forest's failure to comply with the express procedures set forth in the local rules of this District, it would be unduly prejudicial for Sun Forest to be precluded from making a motion because of what was apparently an innocent mistake resulting from its erroneous conclusion that procedural rules from state court would be imported into this Court upon removal. *See, e.g.,* Pl.'s Mem. Supp. Summ. J. at 7–8 (arguing—incorrectly, see pp. 37–38 below—that New York's summary judgment standard applies to this action upon removal).

## A. *Choice of Law*

Sun Forest and the Shvilis take different positions regarding which jurisdiction's substantive law of contracts will govern the Court's disposition of Sun Forest's summary judgment motion. The Shvilis contend that the law of Ontario must be applied, because the choice-of-law provisions contained in the November and January Notes were procured as a consequence of undue influence and overreaching by Mandel (with regard to both of the Shvilis) and Eli (with regard to Paula). Consequently, they argue, Ontario law should govern this action because of Ontario's strong public policy against enforcing contracts procured by undue influence. (Defs.' Mem. Opp. Summ. J. at 23–28.) Sun Forest argues generally that New York courts have a strong presumption in favor of enforcing choice-of-law clauses. (Pl.'s Mem. Supp. Summ. J. at 4.)

 In determining whether to honor a contract's choice-of-law clause, a district court sitting in diversity applies principles adopted by its forum state. *Klaxon Co. v. Stenior Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under N.Y. Gen. Oblig. § 5–1401, parties to a contractual agreement worth more than $250,000 may freely agree to stipulate that New York law shall govern any disputes arising out of the transaction:

> The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection one of section 1–105 of the uniform commercial code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state.

Section 5–1401 does not provide for any exceptions that would permit a court to decline to enforce a choice-of-law clause if the clause would infringe a fundamental public policy interest of the conflicting jurisdiction. *Supply & Building Co. v. Estee Lauder Int'l, Inc.*, No. 95 Civ. 8136(RCC), 2000 WL 223838, at *2–3 (S.D.N.Y. Feb.25, 2000).[32] Additionally, Section 1–105(1) of New York's Uniform Commercial Code contains a choice-of-law rule broadly applicable to contracts (such as promissory notes) that are governed by code provisions. It reads as follows:

> ... [W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights or duties.

A court may disregard a choice-of-law clause if a party seeking to invalidate the clause makes a showing that it was specifically procured as a result of fraud. *See, e.g., Marine Midland Bank, N.A. v. Unit-*

---

**32.** *SG Cowen Securities Corp. v. Messih*, No. 00 Civ. 3228(HB), 2000 WL 633434 (S.D.N.Y. May 17, 2000), which is cited by the Shvilis for the broad proposition that choice-of-law provisions are freely voidable if they conflict with the public policy of the foreign jurisdiction, is distinguishable. In that case, the court found that N.Y. Gen. Oblig. § 5–1401(1) was inapplicable because the agreement at issue concerned employment issues, which are specifically exempted from the statute's coverage. *Id.* at *3 n. 2. Additionally, the rule the Shvilis attempt to find in *SG Cowen* appears to be at variance with Second Circuit case law stating that a choice-of-law clause will only be invalidated if it conflicts with the public policy of *New York*. *See, e.g., Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., OOCL*, 230 F.3d 549, 556 (2d Cir.2000).

*ed Missouri Bank, N.A.*, 223 A.D.2d 119, 123, 643 N.Y.S.2d 528, 531 (1st Dep't 1996); *PC COM, Inc. v. Proteon, Inc.*, 946 F.Supp. 1125, 1129 (S.D.N.Y.1996). But for essentially the same reasons discussed above with respect to the forum-selection clauses, the Shvilis have not established, or even suggested, that the choice-of-law clause itself was the product of over-reaching by Mandel; they have argued only that he prevailed on them to sign the Notes. The Notes, which were knowingly signed by the Shvilis, provide that this claim is to be resolved under New York law.

Both of the Notes contain the following choice-of-law provision:

> The enforcement of this Note and any obligations hereunder ... shall be governed by and construed in accordance with the laws of the State of New York, U.S.A.

(Mandel Aff. Exs. A & C.) The November Note specifies that the Shvilis are required to pay, in the aggregate, principal and accrued interest to Mid–City (which later endorsed the note to Sun Forest) in the amount of approximately $2 million, far in excess of the $250,000 minimum required by N.Y. Gen. Oblig, § 5–1401. As demonstrated above in the Court's discussion of the validity of the November Note's forum-selection clause (see pp. 21–23 above), the Shvilis fail to make a specific showing that the clause was procured by fraud. Accordingly, the Note's choice-of-law clause falls within the purview of N.Y. Gen. Oblig. § 5–1401(1), and shall be enforced.

The January Note states that the Shvilis are required to pay principal and accrued interest to Mid–City (which later endorsed the note to Sun Forest) in an aggregate amount of approximately $37,000. Given the relatively small amount due on the note, its choice-of-law clause is not covered by N.Y. Gen. Oblig. § 5–1401(1). However, because the clause is incorporated into the text of a promissory note governed by New York's Uniform Commercial Code, it will be enforceable under N.Y. U.C.C. 1–105(1) if there is a "reasonable relation" between the note and New York State. *See, e.g., Marine Midland Bank, N.A.*, 223 A.D.2d at 123, 643 N.Y.S.2d at 530. The Official Comment to section 1–105 states that a court should find a reasonable relation to exist "where a significant enough portion of the making or performance of the contract is to occur or occurs." N.Y. U.C.C. 1–105 Official Comment (1). Here, the note requires that payment be made at the offices of Sun Forest, which are located in New York City. (Mandel Reply Aff. ¶ 1, 8.) Moreover, Sun Forest is a New York corporation (*Id.* ¶ 11), and the Notes evidence loans that were for the most part made in New York by a New York resident or entity. Accordingly, in the absence of any showing by the Shvilis that the choice-of-law clause was specifically procured by fraud, there is a sufficient nexus between the January Note and New York State such that the choice-of-law clause shall be enforced.

Finally, even if the choice-of-law clause were disregarded, New York's choice-of-law rules would dictate that New York law governs issues relating to the enforcement of the Notes. In a contract case involving a putative conflict of laws, a court employs a "grouping of contacts" approach to determine which of the jurisdictions "has the most significant relationship to the transaction and the parties." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 318, 618 N.Y.S.2d 609, 612, 642 N.E.2d 1065, 1068 (1994) (internal quotations omitted). The contacts to be evaluated in making a choice-of-law determination include the following: (1) the place of contracting, (2) the places

of negotiation and performance, (3) the location of the subject matter, and (4) the domicile or place of business of the contracting parties. *Id.*

■ Applying the foregoing factors to the instant case, although the Shvilis are Ontario domiciliaries who apparently executed the Notes in their home province (Eli Shvili Aff. ¶¶ 8–9; Paula Shvili Aff. ¶¶ 6–7), the other choice-of-law factors all weigh strongly in Sun Forest's favor. Mid–City (and Sun Forest, its successor) are New York corporations with principal places of business in this state. (Mandel Reply Aff. ¶ 1.) The funds supplied by Mid–City (or Mandel) for the alleged loans to the Shvilis and their affiliated entities were drawn from bank accounts located in New York City. (*Id.* ¶¶ 24–29, 32–33, 38, 42.) Moreover, both the November and January Notes specify that they are payable on demand at Mid–City's offices here. (Goldey Aff. Exs. F & G.) It is clear, therefore, that New York has a more significant nexus to the Notes that underlie this action and should therefore supply the governing law.

### B. Standard for Summary Judgment

In its memorandum in support of its motion for summary judgment, Sun Forest cites to several New York authorities regarding the standard for prevailing on such a motion. (Pl.'s Mem. Supp. Summ. J. at 7–8.) However, it is well-established that when an action commenced in state court as a motion for summary judgment in lieu of complaint is removed to federal court, subsequent proceedings are governed by the familiar standard set forth in Fed.R.Civ.P. 56. *See, e.g., Com/Tech Comm. Tech. Inc.,* 163 F.3d at 151.

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing summary judgment "may not rest upon mere allegations or denials"; rather it must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, a party cannot defeat summary judgment by "offering purely conclusory allegations," *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985), or by offering evidence in opposition that is merely speculative. *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116–1117 (2d Cir.1988).

### C. The Shvilis' Contract Defenses

As stated above, Sun Forest has moved for summary judgment against Eli and Paula Shvili on breach of contract claims arising out of the Shvilis' failure to pay amounts due on the November and January Notes. At oral argument, counsel for the Shvilis conceded that Mandel is entitled to recoup at least some of the money due on the Notes, but disputed whether all of the antecedent transactions could properly be characterized as "loans," and therefore argued, on a variety of legal theories, that issues of fact exist that preclude summary judgment for the total amount of the Notes. (Tr. at 45.) The Shvilis' various defenses will be considered

in turn.[33]

### 1. *Consideration*

The Shvilis first argue that the promissory notes are not supported by consideration, because at least some of the "loans" from Mid–City that underlie the Notes were actually payments made in paid in exchange for equity interests in various of Eli's ventures. Accordingly, the Shvilis contend that the Notes are unenforceable *pro tanto*, because they are not supported by consideration equal to the amounts due under the Notes. (Defs.' Mem. Opp. Summ. J. at 17–18.)

■ Even assuming *arguendo* that some of the "loans" made by Mid–City were actually purchases of equity, the Shvilis' argument fails as a matter of New York law. Under N.Y. U.C.C. § 3–408, a promissory note provided to evidence an "antecedent obligation," such as a debt, does not need to be supported by consideration independent of that which was previously furnished for the loan. *See* § 3–408; *Perlstein v. Kullberg Amato Picacone*, 158 A.D.2d 251, 252, 550 N.Y.S.2d 883, 884 (1st Dep't 1990); *Tabor v. Logan*, 114 A.D.2d 894, 495 N.Y.S.2d 67, 68 (2d Dep't 1985); *Citicorp Int'l Trading Co., Inc. v. Western Oil & Refining Co., Inc.*, 790 F.Supp. 428, 435 (S.D.N.Y.1992).

■ Moreover, the Official Comment to section 3–408 makes it amply clear that a note's maker is obligated to pay even when the amount due on the note is not supported by consideration equal to the amount of an antecedent obligation:

> [A]n instrument given for more or less than the amount of a liquidated obligation does not fail by reason of the common law rule that an obligation for a lesser liquidated amount cannot be consideration for the surrender of a greater.

Official Comment (2) to N.Y. U.C.C. § 3–408. *See also Blanshan v. Russell*, 32 A.D. 103, 52 N.Y.S. 963, 964 (3d Dep't 1898) ("It is true that an existing indebtedness for a certain amount will sustain a promise to pay a much greater amount ...."), *aff'd*, 161 N.Y. 629, 55 N.E. 1093 (1899). Here, counsel for the Shvilis conceded at oral argument that Sun Forest is entitled to receive some amount of reimbursement for providing money to Eli Shvili, even if there is some dispute over whether all of those antecedent transactions should be characterized as loans. (Tr. at 45.)[34] Accordingly, it is clear that even if the Notes are for an amount greater than that which was indisputably owed to Mandel, the Notes are valid and enforceable under New York law.

The Shvilis contend, however, that they should only be required to pay such por-

---

**33.** Sun Forest has conceded that it is not a holder of the Notes in due course (Pl.'s Mem. Supp. Summ. J. at 7 n. 4) and, therefore, is subject to the various defenses asserted by the Shvilis against Mandel. *See* N.Y. U.C.C. § 3–306.

The Shvilis also contend that Sun Forest does not have standing to collect payments due on the November and January Notes, because they were endorsed over to Sun Forest by Mid City after the service of demands for payment on November 22, 2000. (Defs.' Mem. Opp. Summ. J. at 14.) However, following Mandel's claim (Mandel Reply Aff. ¶ 1 n. 1) that the Shvilis argument is based on a

typographical error in his original affidavit, the Shvilis have apparently abandoned this defense.

**34.** The Notes in question both state that the Shvilis would make payments on demand in consideration "for the value" that they received from Mid–City. Under New York law, a party executing a promissory note containing such a statement "is precluded from denying receipt of the consideration recited therein." *Cumis Ins. Society, Inc. v. Dominic*, No. 95 Civ. 10221(SS), 1997 WL 151120, at *3 (S.D.N.Y. Apr.1, 1997) (Sotomayor, J.).

tion of the face amounts of the Notes as Sun Forest can prove corresponds to amounts that were previously provided as loans, citing the final sentence of section 3–408 ("Partial failure of consideration is a defense pro tanto . . . .") (Defs.' Mem. Opp. Summ. J. at 18–19.) But this misconstrues the concept of failure of consideration. It is hornbook law that "mere inadequacy in the value of [the consideration] is never intended by the legal expression, want or failure of consideration. This only covers either total worthlessness to all parties or subsequent destruction partial or complete." *Cowee v. Cornell*, 75 N.Y. 91 (1878). *See also Dafnos v. Hayes*, 264 A.D.2d 305, 306, 694 N.Y.S.2d 42, 44 (1st Dep't 1999). The sentence relied on by the Shvilis does not mean that a note given to evidence an antecedent loan is only valid up to the provable amount of the loan.

■■■■■ At any rate, the Notes are supported by consideration even without reference to section 3–408. Mid–City's forebearance of its right to demand payment from the Shvilis on an earlier note due on October 29, 1999, constitutes consideration that independently supports the November Note. *See, e.g., Miller v. Steloff*, 686 F.Supp. 91, 94–95 (S.D.N.Y.1988). It is a long-established rule in New York that forebearance to collect a debt when due supports a promissory note, whether signed by the debtor or by a third party. *See Strong v. Sheffield*, 144 N.Y. 392, 394–95, 39 N.E. 330, 331 (1895). Moreover, to the extent that cash advances by Mandel were originally intended as capital contributions in exchange for an equity share of certain business interests of the Shvilis, the conversion of that putative equity into

a debt would constitute consideration for the Notes. If the legal status of the payments were disputable before the Notes were created, the reduction of the parties' relations to an agreed amount and nature would surely constitute mutual consideration in the nature of a settlement. *Cf.* N.Y. Gen. Oblig. § 5–1103.

■■■■■ Paula Shvili also contends, without citing any authorities, that her execution of the Notes is invalid, because she did not receive any consideration—for either the antecedent obligation or the Notes themselves—independent of that which flowed to her husband. (Defs.' Mem. Opp. Summ. J. at 19.) However, it is long established in New York law that a spouse who signs a note as a co-obligor or surety with knowledge that doing so will inure to the benefit of his or her spouse does not need to receive independent consideration for his or her execution to be deemed valid. *See, e.g., William Trimbey Co. v. Lindblom*, 211 A.D. 168, 169, 206 N.Y.S. 622, 623 (4th Dep't 1924) ("Under the circumstances when she signed the notes at her husband's request, with knowledge that signing them would increase her husband's credit, it constituted a good consideration . . . and she cannot escape liability.").[35] In the instant litigation, Paula Shvili avers that she signed the November Note because "I understood from my husband that if the document was not signed my husband's business relationship with Mandel would be harmed." (Paula Shvili Aff. ¶ 6.) The evidence of record therefore clearly reflects that she understood that her co-signing the Notes would benefit her husband and the couple's financial situation.

---

**35.** This rule essentially follows the basic principles of *Strong v. Sheffield, supra.* Even without the close personal relationship between spouses, or the likelihood that one spouse will benefit from an economic benefit to the other, consideration can take the form of a benefit (such as forebearance) to a third party that the promisor for whatever reason chooses to bargain for.

Consequently, her defense of lack of consideration also fails as a matter of law.[36]

### 2. Mandel's Putative Overreaching

The Shvilis' next line of defenses arises out of their contention that Mandel abused his alleged attorney-client relationship with them in an effort to secure their signatures on the Notes. The Shvilis argue that because Mandel exercised undue influence over them in an effort to have them co-sign the promissory notes at issue, the Notes are voidable under New York law as a consequence of his overreaching. (Defs.' Mem. Opp. Summ. J. at 10–11, 19–20.) Separately, Paula Shvili contends that her husband used undue influence in an effort to obtain her signature on the Notes as a co-obligor. (*Id.*)

Additionally, in supplemental briefing filed subsequent to oral argument, both of the Shvilis further contend that even if Mandel's conduct did not rise to the level of undue influence, the Notes are voidable because Mandel, as their putative attorney, violated New York common law by engaging in business transactions with his clients so as to benefit commercially because of his superior understanding of legal matters. (Defs.' Letter Brief Dated March 19, 2001, at 1–3.) These defenses present closer questions.

### a. Undue Influence

■ The principle that courts will not examine the sufficiency of consideration applies "except as bearing upon undue influence." *Cowee v. Cornell,* 75 N.Y. 91 (1878). Undue influence can vitiate contractual arrangements. Under New York law, a party claiming that it was unduly influenced to enter a contractual relation-

ship must prove that it contracted under circumstances indicating that a "relationship of control" existed and that the "stronger" of the two parties had exerted influence over the other to "destroy the weaker party's free will and substitute for it the will of the [other]." *Hoffmann v. Sprinchorn,* No. 95–CV–05793E (Sc), 1997 WL 128352, at *3 (W.D.N.Y. Mar.13, 1997) (internal quotations omitted); *see also North American Rayon Corp. v. Commissioner of Internal Revenue,* 12 F.3d 583, 589 (6th Cir.1993) (applying New York law). The burden is heavy: a party seeking to invalidate a contract must demonstrate that it was manipulated into signing a contract as a consequence of conduct worse than "even pressure, no matter how bad" because "undue influence is tantamount to a species of cheating." *Kazaras v. Manufacturers Trust Co.,* 4 A.D.2d 227, 238, 164 N.Y.S.2d 211, 221 (1st Dep't 1957) (Breitel, J.). Moreover, a court considering an undue influence defense must find that there was an "advantage sought and obtained for the actor or another in whom he has an interest." *Id.,* 4 A.D.2d at 237, 164 N.Y.S.2d at 220.

■ On the evidence of record, the Shvilis cannot, as a matter of law, demonstrate that Mandel unduly influenced them into executing the Notes. With regard to the November Note, they both aver that they did not wish to sign it. (Eli Shvili Aff. ¶ 8; Paula Shvili ¶ 6.) As for the January note, Eli states that he "did not wish to sign it" (Eli Shvili Aff. ¶ 9); Paula states that Mandel "insisted" that she sign, and that she felt pressured by him. (Paula Shvili Aff. ¶ 7.) Accepting, as we must for purposes of this motion, the Shvilis' ac-

---

**36.** There is also a dispute among the parties as to whether Mandel's various payments to Kimoo, the company wholly owned by Paula, constituted personal loans to Paula. If so— and if the payments were reflected in the November and January Notes as antecedent obligations—there would clearly be adequate consideration to support Paula's status as co-obligor.

count,[37] Mandel's alleged conduct, which at most consisted of urging or pressuring them to sign the Notes, fell far short of the subversion of free will that must be proven to void a contract based on an undue influence defense. The Shvilis cite no misrepresentation or threat by Mandel, nor any way in which he affirmatively used his alleged relationship with them to persuade them that signing the Notes was in their interest. Nothing about the transaction suggests the Shvilis did not act of their own free will. Indeed, apart from their conclusory and rather bland assertions that they did something they did not "wish" to do, neither Eli nor Paula asserts that they were coerced or that their will was overborne, nor does either of them identify any conduct by Mandel that could even conceivably be regarded as capable of "destroy[ing] the . . . free will," *Hoffmann,* 1997 WL 128352, at *3, of a person of ordinary intelligence and fortitude—let alone an experienced, sophisticated businessman such as Eli Shvili. Being persuaded or cajoled to do something one does not "wish" to do is not the same thing as being deprived of free will or subjected to undue influence.

█ As for Paula Shvili's contention that she was unduly influenced by her husband into executing the Notes, she again states that she did "not want to sign" the November Note but did so only "because I trusted my husband and his judgment on business affairs. I understood from my husband that if the document were not signed my husband's business relationship with Mandel would be harmed." (Paula Shvili Aff. ¶ 6.) Regarding the January Note, she avers, "My husband also wanted me to sign the second promissory note. When I expressed that I

did not want to do so he said words to the effect of 'Don't worry, it's o.k.'" (*Id.* ¶ 7.) Even if true, these allegations suggest that Eli engaged in nothing more than persuasion to obtain his wife's signature on the Notes, conduct that fell far short of an effort to subvert her free will and which did not, as a matter of law, constitute undue influence. If anything, Paula's affidavit reveals that she signed the Notes to assist her husband in his business and because she trusted his advice—perfectly plausible and legitimate motives.

### b. *Impermissible Attorney–Client Transactions*

█ While the circumstances of this case do not establish a genuine issue of undue influence, the Shvilis' allegation that Mandel was their attorney casts the problem in a different light. New York courts cast a wary eye on business contracts between attorneys and their clients. "An attorney is not prohibited from entering into a contract with a client"—"although it is not advisable . . . with respect to matters not involving legal services, or in addition to legal services." *Greene v. Greene,* 56 N.Y.2d 86, 92, 451 N.Y.S.2d 46, 48, 436 N.E.2d 496, 499 (1982). Because of the fiduciary relationship between attorney and client, however, the burden is on the attorney to demonstrate that the contract is a fair one; the lawyer "cannot take advantage of his superior knowledge and position" in commercial dealings with a client. *Id.,* 56 N.Y.2d at 92, 451 N.Y.S.2d at 49, 436 N.E.2d at 499. This "basic rule" according to the New York Court of Appeals, *id.,* has been unchanged since at least 1877:

> An attorney who seeks to avail himself of contract made with his client is bound

---

37. Mandel disputes the Shvilis' version of the events, averring, for example, that he did not "'pressure' the Shvilis to sign promissory notes evidencing the indebtedness." (Mandel Reply Aff. ¶ 49.)

to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney, and was in every respect free from fraud on his part, or misconception on the part of the client, and that a reasonable use was made by the attorney of the confidence reposed in him.

*Whitehead v. Kennedy,* 69 N.Y. 462, 466 (1877); *see also Mar Oil, S.A. v. Morrissey,* 982 F.2d 830, 838 (2d Cir.1993). The contract is not voidable, however, unless "it appears that the attorney got the better of the bargain." *Id.* (internal quotations omitted); *see also In re Broder,* 265 A.D.2d 218, 219, 696 N.Y.S.2d 459, 460 (1st Dep't 1999).

This rule is distinct from, and stricter than, the rule invalidating contracts produced by undue influence. The New York Court of Appeals made that quite plain in *Greene:*

> Under this rule it is not necessary for the client to show that the agreement was obtained by fraud or undue influence on the part of the attorney ... Even in the absence of such misconduct the agreement may be invalid if it appears that the attorney 'got the better of the bargain,' unless he can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney.

56 N.Y.2d at 92, 451 N.Y.S.2d at 49, 436 N.E.2d at 499.

On this record, genuine factual issues relating to this defense preclude a finding that Mandel is entitled to summary judgment. First, there is a factual issue as to whether Mandel was in fact an attorney for the Shvilis. Despite Mandel's conclusory allegations that he never had an attorney-client relationship with Eli, the evidence of record strongly suggests that such a relationship did indeed exist throughout, at the very least, the 1997–1999 time period. For example, in an August 28, 1997, letter Mandel sent to counsel for the Consortium for Central Harlem Development, Inc. (an organization that initially had an equity position in the Harlem Group), he referred to Eli as his "client." (2d Goldey Aff. Ex. L.) Mandel also billed Eli for 11.4 hours of work he performed in his capacity as counsel to White & Case on the Gulf Interstate transaction between the March 11, 1998, and July 27, 1998 period. (3d Goldey Aff. Ex. Y.) Moreover, Mandel's participation in meetings with Eli at White & Case, where Mandel was "of counsel" or "partner emeritus," involving Eli's proposed transactions in Egypt in 1997 and Qatar in 1999 (Mandel Reply Aff. ¶¶ 22(a), (c) & (d); Goldey Aff. Ex. C at 2) indicates that he continuously functioned as an attorney-advisor to Eli.

But if Mandel had an attorney-client relationship with Eli at the time Eli executed the November and January Notes, Mandel was required to make full disclosures of all material knowledge he possessed regarding the promissory notes and "the consequences" of Eli's executing them. *Greene,* 56 N.Y.2d at 92, 451 N.Y.S.2d at 49, 436 N.E.2d at 499. There is no indication in the evidence of record, however, that Mandel ever made any legal disclosures to Eli regarding the Notes. On the other hand, an inference could be drawn from Eli's business sophistication that he was fully aware of the significance of signing a promissory note. Moreover, the exact nature of the attorney-client relationship would be relevant to determining whether there was any exploitation of the relationship in the creation of the Notes. Accordingly, there are significant issues of fact as to whether "the client was fully aware of the consequences" and

whether "there was [any] exploitation of the client's confidence in the attorney." *Id.*

There are also issues of fact concerning whether Mandel received the "better of the bargain" in his commercial dealings with Eli. It is more than arguable that the creation of the Notes conferred significant advantages on Mandel. Under New York law, a promissory note is evidence of a preexisting debtor-creditor relationship between the parties that have executed it. *See, e.g., Scaccia Concrete Corp. v. Hartford Fire Ins. Co.,* 720 N.Y.S.2d 193, 194 (2d Dep't 2001) (per curiam). Consequently, by obtaining Eli's signature on the Notes, Mandel may have secured the following advantages over Eli. First, as set forth above, New York contract law permits parties to enter into a promissory note for an amount greater than the antecedent indebtedness given as consideration. Second, considering that there are disputed factual issues concerning the nature of the commercial relationship between Eli and Mandel, it is entirely possible that Mandel may have obtained Eli's signature to evidence the conversion of equity purchases in Eli's business ventures into debt, which may well have been advantageous to Mandel at that point. Third, given the paucity of contemporaneous documentation concerning the parties'

dealings, it is also possible that Mandel sought to receive an evidentiary benefit under New York law by getting Eli to sign the Notes to evidence indebtedness that would otherwise be provable only by a swearing contest between Mandel and Eli.[38]

With regard to Paula Shvili's assertion that her transactions with Mandel are voidable, the Court finds that there are genuine issues of material fact concerning not only whether she had an attorney-client relationship with Mandel, but also whether Mandel, if he did act as her attorney, made adequate disclosures to her and "got the better of the bargain" as a result of her decision to co-sign the November and January Notes. Paula Shvili avers that her husband used to refer to Mandel as "our lawyer," and that Mandel offered to perform trusts and estates work on her behalf and obtained confidential information about her assets in this capacity. (Paula Shvili Aff. ¶ 4.)[39] Mandel denies that he ever acted as Paula's attorney. (Mandel Reply Aff. ¶ 4.)

■■■ For an attorney-client relationship to arise under New York law, it is not necessary for the parties to enter into a formal written retainer agreement; rather, a court must scrutinize "the words and

---

**38.** Although Eli avers conclusorily that the funds he received from Mid–City reflected Mid–City's purchase of equity positions in ventures—not loans—(Eli Shvili Aff. ¶¶ 5-7) it is notable that he, unlike his wife, has made no effort specifically to rebut Mandel's numerous detailed assertions about Mid–City's history of lending money to Eli. Indeed, the Shvilis' counsel admitted at oral argument (without specifically characterizing the transactions as "loans") that Mandel (through Sun Forest) is entitled to some remedy to compensate him for the funds advanced to Eli. (Tr. at 45.) However, given that Mandel (with the exception of a letter accompanying the January 21, 2000, loan to Kimoo (Mandel Reply Aff. ¶ 42 & Ex. 36)) has not offered any docu-

mentary evidence to bolster his own conclusory allegations about the parties' commercial dealings, the Court, on a motion for summary judgment, cannot, pursuant to the requirements of Fed.R.Civ.P. 56, weigh Eli and Mandel's conflicting accounts.

**39.** Paula and Martin Bernholtz, the Vice President of Finance for the Kerbel Group, state that Paula supplied a list of her assets to Mandel in 1998. (2d Paula Shvili Aff. ¶ 7; Bernholtz Aff. ¶ 6.). Bernholtz further avers that Mandel sought the information to provide the Shvilis with "international tax advice." (Bernholtz Aff. ¶ 6.)

actions of the parties" to determine whether there was ever such a relationship. *Kubin v. Miller*, 801 F.Supp. 1101, 1114 (S.D.N.Y.1992) (internal quotations omitted). If Mandel did in fact offer his legal services to Paula to assist her in preparing her estate, that alone could constitute grounds for determining that an attorney-client relationship existed between Mandel and her. However this issue is ultimately to be resolved, at the current stage of the proceedings, it is plain that an issue of fact exists as to whether Mandel ever made such an offer to Paula and if he ever performed services on her behalf (or for the couple jointly).

Assuming for the purposes of this motion that Mandel was Paula's attorney, he was required to make full disclosures of all material knowledge he possessed regarding the promissory notes and "the consequences" of her executing them. *Greene*, 56 N.Y.2d at 92, 451 N.Y.S.2d at 49, 436 N.E.2d at 499. Mandel avers that Paula had a complete understanding of what the Notes represented, and evidenced this knowledge by, among other things, providing him with a "list of her personal assets" to demonstrate she could pay the Notes. (Mandel Reply Aff. ¶ 50.) [40] Paula, however, denies that Mandel told her anything about the Notes' legal import at the time she executed them. (Paula Shvili Aff. ¶ 8.) Mandel also claims that Paula may have sought legal advice from Eli Gutstadt, the Shvilis' Ontario-based attorney. (Mandel Reply Aff. ¶ 52.) However, Gutstadt avers that he never advised Paula about the

Notes. (Gutstadt Aff. ¶¶ 5–7.) It is obvious, therefore, that the evidence of record is replete with disputed issues of material fact regarding the quantum of advice that Mandel (or a third-party attorney) provided Paula before she executed the Notes.

Moreover, there are issues of fact as to whether Mandel "got the better of the bargain" as the result of his transactional dealings with Paula. From the outset of this action, the parties have circled around a key issue that is not determinable from the evidence of record: the extent to which Eli Shvili holds sufficient assets to repay Mandel's loans. If Eli personally holds so few of the couple's assets that any attempt to enforce a judgment against him would yield Sun Forest significantly less than the approximately $2 million owed on the November and January Notes, it is possible that Mandel received a substantial benefit by having Paula, who claims that she did not personally receive loan proceeds from Mandel or the entities he controls, execute the Notes as a co-obligor.[41]

Consequently, on the limited record presently before the Court, there are genuine issues of material fact relating to whether Mandel was Paula's attorney at the time she co-signed the November and January Notes. And if Mandel was Paula's attorney, there are also issues of fact concerning the adequacy of disclosures that he made to her about the consequence of signing and whether he consequently "got the better of the bargain." Therefore, it cannot be said that there are no

---

**40.** Mandel's account of how and why he obtained this list thus is sharply at odds with Paula's. *See* note 39 *supra*.

**41.** Mandel claims that Mid–City lent $300,000 to Kimoo, Paula's wholly-owned company on January 7, 1999, which, if true, would demonstrate that Paula was personally involved in the various financial dealings that gave rise to the Notes. However, as demonstrated above,

Paula and other witnesses contend that Mandel actually used the money to purchase an equity interest in Kimoo, which creates an issue of fact. The evidence of record is also unclear as to whether a $50,000 payment from Mid–City to Kimoo on March 24, 1999, and a $36,734.45 payment on January 21, 2000, were loans to Paula.

material issues of fact to be tried regarding Paula's liability on the Notes.

It is far from clear that the Shvilis' claim that the Notes constitute a voidable attorney-client transaction will ultimately prove to have merit. Discovery may show that Mandel's involvement with Eli was so predominantly a business (and not attorney-client) relationship that any legal advice rendered was so incidental that the New York rule should not apply, and/or that he provided no legal services to Paula at all. Also, a fuller exploration of the underlying transactions may undermine the Shvilis' somewhat sketchy claims that Mandel's payments were something other than loans; in that event, perhaps it will become plain that Mandel secured no advantage over the Shvilis by securing the Notes at issue, but merely, as he contends, obtained nothing more than his due—a promise to pay what was owed. Discovery may also cast enough light on Paula's business dealings to clarify whether she was a wealthy but naive spouse, cajoled by someone she thought was her lawyer into putting her assets behind her husband's debts, or a full partner from the start in family ventures. Such further development of the record may entitle Mandel to prevail at trial, or even on summary judgment after discovery. But these are not issues that can be resolved on affidavits. Given the existence of genuine issues material to a legitimate potential defense, summary judgment cannot be granted at this stage of the case.

Moreover, it certainly cannot be concluded that the Shvilis would have any defense at all to a cause of action based on any underlying loan transactions that Mandel could prove. With respect to the loans themselves, as distinct from the later-executed Notes, it is hard to see how Mandel, even if he was the Shvilis' attorney, could be seen to have gotten the "better of the bargain" in transactions in which he lent money to them at a reasonable rate of interest, or that there were any particular legal wrinkles in such a simple transaction that would require any special disclosure. But the exact nature of those transactions, which were not memorialized in contemporaneous documents, is plainly not a subject for summary resolution. Ironically, it is precisely to the extent that embodying this jumbled relationship after the fact in promissory notes creates an opportunity for summary judgment and defeats a number of the Shvilis' potential defenses that the creation of the Notes arguably conferred benefits on Mandel at the Shvilis' expense—benefits which, if he was indeed their lawyer, he would be obliged to show he fully disclosed and explained to them.

## CONCLUSION

For the foregoing reasons, the Shvilis' motions to dismiss for lack of personal jurisdiction and for *forum non conveniens* are denied. Sun Forest's motion for summary judgment on claims asserted against Eli Shvili and Paula Shvili is denied, without prejudice to later renewal.

SO ORDERED.